UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12449 EFH

PAUL WILLETT,          )
          Plaintiff     )
                        )
     v.                 )
                        )
E & S FISHERIES, INC.,  )
          Defendant     )

## DEFENDANT E & S FISHERIES, INC.'S MOTION FOR SUMMARY JUDGMENT

Now comes the defendant E & S Fisheries, Inc. (the "defendant") and hereby moves for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. As grounds for

this motion, the defendant states that there are no material facts which are in dispute and that the

defendant is entitled to summary judgment as a matter of law. In further support, the defendant

submits the attached memorandum of law in support of its motion and accompanying documents.

For the Defendant,
E & S Fisheries, Inc.,
By its attorneys,

**REGAN & KIELY LLP**

/s/ Robert E. Kiely
Robert E. Kiely, Esquire (BBO #556640)
85 Devonshire Street
Boston, MA 02109
(617)723-0901

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12449 EFH

PAUL WILLETT,         )
        Plaintiff    )
             )
     v.         )
             )
E & S FISHERIES, INC.,   )
        Defendant   )

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT E & S FISHERIES, INC.'S MOTION FOR SUMMARY JUDGMENT

Now comes the defendant in the above-captioned matter, E & S Fisheries, Inc. (the "defendant"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

1.     On or about August, 2003, Paul Willett ("Willett" or the "plaintiff") commenced working as a deck hand for the defendant on the defendant's commercial scallop vessel, F/V LIBERTY. Plaintiff's Deposition (attached as **Exhibit A**), 19:15-17; 30:14-17; 31:6-7.

2.     As a deck hand, the plaintiff performed duties including maintaining the gear on the vessel, picking and cutting scallops, cleaning up the boat when the scalloping trips were finished, and assisting in the galley. Plaintiff's Deposition, 32:10-33:6.

3.     On October 25, 2003, the F/V LIBERTY was approximately 60-70 miles off Point Pleasant, New Jersey. Plaintiff's Deposition, 42:1-7. The vessel was approximately 4-5 days into a trip. Plaintiff's Deposition, 42:18-43:2. The plaintiff was working on deck

with another vessel employee laying and cutting scallops. Plaintiff's Deposition, 42:1-3; 43:21-23. The plaintiff was proceeding across the deck, from the cutting box to the stern, and felt something stab into the top of his second left toe. Plaintiff's Deposition, 44:23-45:15; 48:19-23.

4.    At the time, the plaintiff was wearing a pair of his sweat pants or long johns, black leather boots, and a pair of oiler pants (oilskins). Plaintiff's Deposition, 45:16-23. None of the equipment worn by the plaintiff was provided to him by the defendant. Plaintiff's Deposition, 46:3-19. The black boots worn by the plaintiff were fairly new and extended to the plaintiff's mid-calf. Plaintiff's Deposition, 46:20-47:5. The plaintiff's oilskins extended down over the top of the boot, going on the outside of the boot. Plaintiff's Deposition, 47:8-15. The plaintiff had also folded the oilskins over and applied an elastic band on each side. Plaintiff's Deposition, 47:8-19.

5.    When the plaintiff felt the jab in his left second toe, he finished working and sat down, where he undid his elastics, took off his boot and his sock, and wiped his foot down. Plaintiff's Deposition, 50:13-22. The plaintiff stated that after removing his sock, he did not see a cut or any blood on his toe. Plaintiff's Deposition, 53:16-54:5. The plaintiff said that shells, sand, and dirt came out when he shook out his boot, which was normal, as the plaintiff shook out his oilers after every watch because debris always made its way into his gear. Plaintiff's Deposition, 52:2-9; 53:1-15. The plaintiff's boots did not have any holes or leaks in them. Plaintiff's Deposition, 55:16-20.

6.    The plaintiff then put his gear back on and finished cutting, washing, and bagging the scallops for approximately one hour and a half. Plaintiff's Deposition, 55:21-56:10.

After finishing with his duties, the plaintiff took off his boots and oilers in the mudroom/ companionway and put on a pair of sneakers or slippers. Plaintiff's Deposition, 56:13-24. The plaintiff then went down to his bunk and washed off his foot with peroxide, applied Neosporin, and put on a new pair of socks. Plaintiff's Deposition, 57:2-6; 61:11-18. The plaintiff saw redness on his toe and what looked like a paper cut on his skin just below the first knuckle of his second left toe. Plaintiff's Deposition, 58:12-59:19.

7.  The plaintiff stated that for the first five minutes after he felt the initial jab on his toe, he felt some uncomfortableness, but over time, the pain diminished. Plaintiff's Deposition, 61:19-62:6. The plaintiff then ate, went to bed, woke up, and applied more peroxide to his toe. Plaintiff's Deposition, 62:9-11.

8.  The plaintiff worked his next watch, went back to bed a second time, and woke up with his toe swelling. Plaintiff's Deposition, 62:17-21.

9.  At that time, the plaintiff informed Captain Nichols that there was something wrong with his toe. Plaintiff's Deposition, 65:2-8. At some point that morning, the plaintiff called his wife and his doctor, in order to get a prescription for antibiotics. Plaintiff's Deposition, 64:19-23.

10. The plaintiff worked his next watch and noticed the pain in his toe worsening. Plaintiff's Deposition, 66:21-8. The plaintiff then told Captain Nichols that he needed antibiotics; the captain told him that they could go in for antibiotics and treatment at a hospital, and that the plaintiff should get back on the boat if he was not admitted to the hospital. Plaintiff's Deposition, 67:14-68:2.

11. The F/V LIBERTY headed back to Point Pleasant, New Jersey and stopped within one-

half of a mile to one mile before the jetty where the Coast Guard came to the vessel and picked up the plaintiff because the vessel could not make its way into the port due to its size. Plaintiff's Deposition, 68:11-69:3.

12. Upon reaching shore, the plaintiff went to the hospital emergency room in Point Pleasant. Plaintiff's Deposition, 70:13. While the plaintiff was receiving treatment in Point Pleasant, New Jersey, the captain asked that the plaintiff keep him apprised of the plaintiff's status and whether or not he would be admitted to the hospital. Plaintiff's Deposition, 75:18-76:2. Initially, the plaintiff was told by a doctor at the hospital that he was going to be admitted. Plaintiff's Deposition, 69:9-12. At that time, the plaintiff notified the captain and the F/V LIBERTY left Point Pleasant and began to head toward New Bedford, Massachusetts. Plaintiff's Deposition, 69:14-16; 75:12-17; 76:3-6. The plaintiff was then told, approximately ten minutes later, that he was not going to be admitted to the hospital because his injury was not that serious. Plaintiff's Deposition, 69:16-19; 70:21. Subsequently, the plaintiff telephoned Captain Nichols to tell him that he was not being admitted, and upon doing so, the plaintiff told Captain Nichols that he would return to the vessel as he had promised since he was not being admitted. Plaintiff's Deposition, 73:7-10. The F/V LIBERTY returned to Point Pleasant to pick up the plaintiff. Upon leaving the hospital, the plaintiff was given an antibiotic and instructions of how to take the antibiotic. Plaintiff's Deposition, 70:23-71:7.

13. The plaintiff then returned to the F/V LIBERTY to continue his work and two or three days later, the plaintiff's toe began to swell. Plaintiff's Deposition, 76:16-77:2. At that time, the plaintiff was brought into New Bedford to receive medical attention. Plaintiff's

Deposition, 77:10. Upon reaching New Bedford, the plaintiff had someone pick him up.

Plaintiff's Deposition, 78:1-2. The plaintiff was admitted to Saint Anne's Hospital.

Plaintiff's Deposition, 78:21-20. When the plaintiff was admitted to Saint Anne's, the

top of his foot from his left second toe was swollen and was dark colored purple.

Plaintiff's Deposition, 79:21-80:17. While receiving treatment at Saint Anne's, the

plaintiff was given IV antibiotics and received treatment for approximately three to four

days. Plaintiff's Deposition, 80:22-81:16.

14.    After the plaintiff was discharged, he had a doctor's appointment several days later, at

which time his foot appeared back to normal with no visible cut or laceration. Plaintiff's

Deposition, 81:20-82:11. The plaintiff was told that "everything was all set" with his toe

and the infection. Plaintiff's Deposition, 80:20-24.

15.    A few days after that doctor's visit, the plaintiff returned to work on the F/V LIBERTY

for a seven to ten day closed-area trip. Plaintiff's Deposition, 83:10-19. At the end of the

trip, the plaintiff's foot started to swell again. Plaintiff's Deposition, 83:20-22.

16.    The F/V LIBERTY came into port in New Bedford, Massachusetts and the plaintiff was

admitted to Saint Anne's Hospital and was given an IV. Plaintiff's Deposition, 85:1-5.

The plaintiff was seen by additional doctors, including a surgeon and an infectious

disease doctor. Plaintiff's Deposition, 85:10-18. The plaintiff stayed in the hospital for

four to five days. Plaintiff's Deposition, 85:24.

17.    Upon his release, the plaintiff had several visits with doctors and did not go with the F/V

LIBERTY on its next two trips. Plaintiff's Deposition, 85:24-86:7.

18.    The next time the plaintiff headed off on a trip with the F/V LIBERTY was early January,

2004. Plaintiff's Deposition, 86:9-13. On that January trip, the plaintiff's foot started to swell during approximately the last twelve to twenty-four hours of the trip. Plaintiff's Deposition, 86:15-17; 87:8-11.

19.     Upon his return, the plaintiff then went to Dr. Piva's office, and was then sent to the surgeon's office by Dr. Piva. Plaintiff's Deposition, 87:16-20. At the surgeon's office, the plaintiff was put on an antibiotic and sent home. Plaintiff's Deposition, 87:22-88:2. The surgeon told the plaintiff at that time that he was going to remove the plaintiff's toe, which he did do several days later. Plaintiff's Deposition, 88:2-9.

20.     Approximately two weeks after having his toe removed, the plaintiff was told by a physician at Charlton Memorial Hospital that the infection was still in the bone of his foot. Plaintiff's Deposition, 89:4-17. While at Charlton, the plaintiff was put on insulin to control his type II diabetes and blood glucose levels. Plaintiff's Deposition, 95:9-10. In or around approximately 1996, the plaintiff was diagnosed with type II diabetes. Plaintiff's Deposition, 24:21-25:10. At that time, the plaintiff was given pills and a diet regimen to control his diabetes. Plaintiff's Deposition, 25:9-12; 27:24-28:7. The plaintiff's father suffered from type II diabetes, as does one of the plaintiff's brothers. Plaintiff's Deposition, 28:21-24.

21.     After the visit to Charlton, the plaintiff went to see Dr. Duncan and Dr. Tabargen at the Lahey Clinic in Burlington, Massachusetts. Plaintiff's Deposition, 90:10-23.

22.     In February, 2004, the plaintiff had a bone resection on the top of his left foot. Plaintiff's Deposition, 92:13-19. The plaintiff was in the Lahey Clinic for approximately one week for that procedure. Plaintiff's Deposition, 92:21. Upon returning home from the Lahey

Clinic, the plaintiff remained in bed for approximately six weeks and had a wound vacuum attached to his foot in order to assist the healing. Plaintiff's Deposition, 96:12-17; 97:8-10.

23. The plaintiff returned to work in approximately August or September, 2004, working as a limousine driver. Plaintiff's Deposition, 94:15-17.

24. The plaintiff joined the New Bedford Fishermen's Welfare Fund to assist him in taking courses in various occupations. Plaintiff's Deposition, 103:1-16. The plaintiff took courses to get his captain's license, his able-bodied seaman's license, his tanker man's papers, and his STCW papers. Plaintiff's Deposition, 103:18-20.

25. On or around February, 2005, the plaintiff received his STCW papers, his tanker man's papers, and a 100-ton captain's license. Plaintiff's Deposition, 104:21-105:7. At some time in late winter or early spring of 2005, the plaintiff went on a four to five day scalloping trip aboard the F/V AGGRESSOR. Plaintiff's Deposition, 101:12-102:1.

26. In May or June, 2005, the plaintiff went to work for Penn Maritime in New York as an able-bodied seaman. Plaintiff's Deposition, 105:12-106:9.

> For the Defendant,
> E & S Fisheries, Inc.,
> By its attorneys,
>
> **REGAN & KIELY LLP**
>
> /s/ Robert E. Kiely
> Robert E. Kiely, Esquire (BBO #556640)
> 85 Devonshire Street
> Boston, MA 02109
> (617)723-0901

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12449 EFH

PAUL WILLETT,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
E & S FISHERIES, INC.,⠀⠀)
⠀⠀⠀⠀⠀Defendant⠀⠀)

## DEFENDANT E & S FISHERIES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Now comes the defendant E & S Fisheries, Inc. (the "defendant") and submits the following memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Paul Willett ("Willett" or the "plaintiff") has failed to allege any facts which would allow him to recover under the theories of Jones Act negligence or unseaworthiness. Within this memorandum, the defendant makes reference to the Plaintiff's Deposition (attached as **Exhibit A**).

## FACTS

On or about August, 2003, Paul Willett ("Willett" or the "plaintiff") commenced working as a deck hand for the defendant on the defendant's commercial scallop vessel, F/V LIBERTY. On October 25, 2003, the F/V LIBERTY was approximately 60-70 miles off Point Pleasant, New Jersey. The plaintiff was working on the deck cutting scallops with another vessel employee while the vessel's engine was shut down and out of gear. As the vessel was preparing to start up again, the plaintiff was proceeding across the deck, from the cutting box to the stern, and felt something stab into the top of his second left toe. After later removing his oilers, boots, and

socks, the plaintiff stated that he did not see a cut or any blood on his toe.  The plaintiff said that shells, sand, and dirt came out when he shook out his boot, which was normal, as the plaintiff shook out his oilers after every watch because debris always made its way into his gear.

After the plaintiff's next watch, the F/V LIBERTY headed back to Point Pleasant, New Jersey so that the plaintiff could get antibiotics for his toe and receive treatment at a hospital.  At first, the plaintiff was told he would be admitted to the hospital, but soon after was told that he would not be admitted because his injury was not that serious.  At the time, the F/V LIBERTY had started to head for New Bedford, Massachusetts, but turned back around to pick up the plaintiff so that he could return to work on the vessel.

Two or three days later, the plaintiff's toe began to swell and the plaintiff was brought into New Bedford to receive medical attention.  The plaintiff was admitted to Saint Anne's Hospital and was given IV antibiotics and received treatment for three to four days.  The plaintiff returned to the F/V LIBERTY a few days later, after his foot appeared normal with no visible cut or laceration.  Towards the end of the vessel's seven to ten day trip, the plaintiff's foot started to swell again and the plaintiff was admitted to Saint Anne's Hospital, where he stayed for four to five days on IV antibiotics.  The plaintiff did not go with the F/V LIBERTY on its next two trips because the plaintiff had several doctor's appointments.  He headed off on a trip on the F/V LIBERTY in early January, 2004, and during the last twelve to twenty-four hours of the trip the plaintiff's foot began to swell.  Eventually, the plaintiff's toe was removed through a surgical procedure, however, this initial surgery did not get all of the infection out of the plaintiff's bone in his foot.  The plaintiff suffered from type II diabetes, and had since 1996, and was put on insulin to control his blood glucose levels.  In February, 2004, the plaintiff had a bone resection

on the top of his left foot and was at the Lahey Clinic for approximately one week for that procedure.  The plaintiff returned to work in approximately August or September, 2004, working as a limousine driver and currently works as an able-bodied seaman for Penn Maritime.

## ARGUMENT

In his complaint, the plaintiff asserts that the defendant is liable for: (1) Jones Act negligence; (2) unseaworthiness; (3) maintenance and cure; and (4) intentional/ negligent failure to provide maintenance and cure.  As discussed below, these theories of liability are not supported by any evidence and are based on the plaintiff's unfounded allegations that the defendant is liable.  Because the plaintiff has not plead facts necessary to establish cognizable claims against the defendant, this is not enough to carry the plaintiff's burden of proof and the defendant should be granted summary judgment.

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c) ; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inference in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly

3

probative, summary judgment may be granted.'" <u>Rogers v. Fair</u>, 902 F.2d. 140, 143 (1st Cir.

1990), *quoting* <u>Anderson</u>, 477 U.S. at 249-50.  Moreover, not every disputed factual issue is

material in light of the substantive law that governs the case.  "Only disputed facts that might

affect the outcome of the suit under the governing law will properly preclude summary

judgment." <u>Anderson</u>, 477 U.S. at 248.

      In his deposition, the plaintiff stated as he was running across the deck of the F/V

LIBERTY, he felt a sharp pain in the top of his second left toe.  Plaintiff's Deposition, 44:23-

45:15; 48:19-23.  The plaintiff stated that when he undid the elastics on his oilers, and took off

his boot and sock, he did not see a cut or any blood on his toe.  Plaintiff's Deposition, 53:16-

54:5.  The plaintiff said that shells, sand, and dirt came out when he shook out his boot, which

was normal.  Plaintiff's Deposition, 52:2-9; 53:1-15.  The plaintiff also stated that his boots did

not have any holes or leaks in them.  Plaintiff's Deposition, 55:16-20.

      In his complaint, the plaintiff alleged that the injury to his toe was caused by the

defendant's negligence and the unseaworthiness of the defendant's vessel, the F/V LIBERTY.

However, the plaintiff makes no specific allegations of the defendant's negligence or

unseaworthiness and states only that he sustained personal injuries while working on the F/V

LIBERTY.  Based on the plaintiff's deposition testimony, it is mere speculation that a shell or

some other sharp object penetrated the plaintiff's left second toe and caused an infection.

Although the plaintiff stated that he saw shells and dirt come out of his boot after shaking it

upside down, he provides no evidence, including any physician's statements, that the cause of the

alleged laceration on his toe and ultimate infection was a piece of shell or debris from the vessel.

Furthermore, the plaintiff has not offered any evidence that the defendant was negligent or that

the F/V LIBERTY was unseaworthy.

I.    <u>**The Plaintiff Has Failed To Offer Any Evidence Supporting His Claim Of**</u>
<u>**Jones Act Negligence.**</u>

Viewing the facts in a light most favorable to the plaintiff, the allegations against the

defendant are based upon pure speculation by the plaintiff.  Liability for negligence under the

Jones Act, 46 U.S.C. App. Sec. 688, generally turns on whether there "was a failure to exercise

the care which should have been exercised under the circumstances." <u>Connolly v. Farrell Lines,</u>

<u>Inc.,</u> 268 F.2d 653, 655 (1st Cir. 1959).  In addition to a showing of negligence, there must be a

showing that the negligence played a part, however minor, in producing the plaintiff's injuries.

*Id*.  Here, the plaintiff simply states that he felt something sharp on his toe while he was cutting

scallops, removed his boot, and did not see any puncture wound or blood.  Plaintiff's Deposition,

53:16-54:5.  There is no evidence whatsoever to suggest that this is anything more than an

unfortunate accident for which no liability would attach.

Furthermore, once the captain of the F/V LIBERTY determined that the plaintiff required

antibiotics for his toe, the captain made a point of turning the vessel around and returning to

shore so that the plaintiff could receive medical treatment.  Plaintiff's Deposition, 68:11-69:3.

While the plaintiff was receiving treatment in Point Pleasant, New Jersey, the captain asked that

the plaintiff keep him apprised of the plaintiff's status and whether or not he would be admitted

to the hospital.  Plaintiff's Deposition, 75:18-76:2.  The plaintiff telephoned Captain Nichols to

tell him that he was not being admitted, and upon doing so, the plaintiff told Captain Nichols that

he would return to the vessel as he had promised since he was not being admitted.  Plaintiff's

Deposition, 73:7-10.  Although the plaintiff claims that he felt pressure from the defendant to

return to work on the F/V LIBERTY, the plaintiff returned voluntarily and after receiving

medical clearance from a physician because his condition had cleared up.

Several days later when the plaintiff's symptoms reoccurred, the captain of the F/V

LIBERTY again brought the plaintiff in to shore to New Bedford, Massachusetts so that the

plaintiff could receive medical treatment. Plaintiff's Deposition, 77:2-10. The plaintiff was

treated at Saint Anne's Hospital for approximately three to four days and was discharged.

Plaintiff's Deposition, 80:22-81:16. Several days later, the plaintiff went to a doctor's

appointment and was told that "everything was all set" with his toe and the infection. Plaintiff's

Deposition, 80:20-24.

Again, the plaintiff voluntarily returned to work on the F/V LIBERTY, this time going on

a seven to ten day closed-area trip. Plaintiff's Deposition, 83:10-19. Towards the end of that

trip, the plaintiff's foot started to swell. Plaintiff's Deposition, 83:20-22. For the third time, the

captain of the F/V LIBERTY brought the plaintiff in to shore to New Bedford to receive medical

treatment, this time the treatment being required by the plaintiff at the end of the vessel's trip.

Plaintiff's Deposition, 84:7-85:3. The plaintiff was admitted to Saint Anne's Hospital and was

released four or five days later. Plaintiff's Deposition, 85:24. After being released, the plaintiff

again chose to return to work on the F/V LIBERTY at some time in January, 2004, after missing

two trips with the vessel due to his ongoing medical treatment. Plaintiff's Deposition, 85:24-

86:7-13.

Although the plaintiff alleges that the defendant was negligent, the defendant did

everything it could to get the plaintiff timely medical care on multiple occasions. Furthermore,

the defendant did not force the plaintiff to return to his duties on the F/V LIBERTY, rather the

plaintiff made a voluntary choice, on three separate occasions, to return to the vessel. Plaintiff's

Deposition, 73:7-10; 83:10-19. The plaintiff independently decided to return to work on the F/V

LIBERTY, likely buoyed by his doctors' diagnoses that he was "all set" and that his infection

was clear, and attempted to mitigate his damages by going back to work.

In considering a motion for summary judgment, the court decides whether a jury could

find negligence based upon the facts of the case. McKinley v. Afram Lines Co., Ltd., 834

F.Supp. 510, 514 (1993); Connolly, 268 F.2d at 655. Based upon the facts pled by the plaintiff

and the plaintiff's deposition testimony, there is no basis upon which a jury could find the

defendant negligent because the defendant made numerous attempts to provide the plaintiff with

medical attention and because there were no negligent appurtenances on the F/V LIBERTY.

Likewise, there is no basis for which a jury could find causation. Accordingly, this Court should

allow summary judgment on the plaintiff's Jones Act negligence claim.

II.    **The Plaintiff Has Failed To Offer Any Evidence Supporting His Claim Of
       Unseaworthiness.**

The plaintiff's claim of unseaworthiness is also not based on any evidence or factual

support. The doctrine of unseaworthiness places a burden on shipowners to furnish a

"seaworthy" ship and to indemnify seamen for injuries caused by any defect in a vessel or its

appurtenant appliances or equipment. Smith v. U.S., 943 F. Supp. 159, 169 (1996). However, a

shipowner is not required to provide an accident-free ship that will withstand every conceivable

peril of the sea. Id. The vessel and its appurtenances simply must be reasonably fit for their

intended use. Id. The plaintiff does not identify how the F/V LIBERTY, its appurtenances, or its

crew were unseaworthy. Rather, the plaintiff speculates that the mere fact that he sustained an

injury to his toe is enough to assert that his injury was caused by an unseaworthy condition of the F/V LIBERTY. The plaintiff must make some showing in regard to his unseaworthiness claim. However, based on the state of the evidence and the plaintiff's deposition testimony, the plaintiff cannot make any such showing.

To prove proximate cause in an unseaworthiness claim, the plaintiff must show that an act or omission is a cause which, in the natural and continuous sequence, unbroken by an intervening cause, produces the results complained of, and without which it would not have occurred. *See* Brophy v. Lavine, 801 F.2d 521, 524 (1986). Here, the plaintiff is unable to provide evidence of proximate cause because he has not, and cannot, identify the act or omission which allegedly caused his injury. For these reason, this Court should allow summary judgment to the defendant on the plaintiff's unseaworthiness claim.

defendant recognizes this duty owed to the plaintiff and has paid such maintenance and cure. The payment of maintenance and cure is a unique obligation that vessel owners owe to seamen who fall ill or become injured while in the service of a vessel. If a seaman becomes ill or injured, the vessel owner has an absolute duty to pay for the seaman's food and lodging – maintenance – as well as any necessary medical expenses – cure – during the seaman's recovery. *See* Whitman v. Miles, 294 F.Supp. 2d 117 (D.Me.2004). Cure consists of payments for all aspects of a seaman's medical care until he reaches maximum medical cure, whereas maintenance is the payment for a seaman's food and lodging. A seaman is entitled to receive maintenance only for expenses actually incurred because the purpose of maintenance is

8

for the seaman to receive food and lodging expenses comparable to that received aboard a

vessel.  *See* <u>Johnson v. United States</u>, 333 U.S. 46, 50 (1948); <u>Maric v. Reinauer</u>

<u>Transportation Cos.</u>, 397 F.3d 120 (2nd Cir. 2005).  As such, the defendant has paid the

plaintiff the maintenance and cure owed to him as a seaman.  To the extent that the plaintiff

disputes the receipt of maintenance and cure, the defendant asserts that this is merely a

question of any outstanding bills the plaintiff may have and is not an issue that needs to be

adjudicated in court.

## CONCLUSION

Although the plaintiff has alleged negligence and unseaworthiness on the part of the

defendant, the plaintiff has not offered any evidence supporting his claims.  For the reasons

stated above, because the defendant has paid the plaintiff all maintenance and cure, and because

none of the material facts in this case are disputed, the defendant is entitled to summary judgment

as a matter of law on the plaintiff's allegations.

WHEREFORE, the defendant E & S Fisheries, Inc. requests that the plaintiff's complaint

be dismissed as a matter of summary judgment because, given the facts alleged, the plaintiff's

claim cannot prevail.

> For the Defendant,
> E & S Fisheries, Inc.,
> By its attorneys,
>
> **REGAN & KIELY LLP**
>
> /s/ Robert E. Kiely
> Robert E. Kiely, Esquire (BBO #556640)
> 85 Devonshire Street
> Boston, MA 02109
> (617)723-0901

# EXHIBIT A

PAUL WILLETT                                                    JANUARY 6, 2006

Page 1

1                                        Volume I
                                         Pages 1-126


                        UNITED STATES DISTRICT COURT
3                 FOR THE DISTRICT OF MASSACHUSETTS
4                                    C.A. NO. 04-12449EFH
5
6       PAUL WILLETT,
                     Plaintiff,
7
        vs.
8                                        .

        E & S FISHERIES, INC.,           :
9                    Defendant.          :
10
11
12            DEPOSITION of PAUL WILLETT, taken on behalf of
        the Defendant, pursuant to the applicable provisions
13      of the Massachusetts Rules of Federal Procedure,
        before Barbara M. Montijo, a Registered Professional
14      Reporter and Notary Public within and for the
        Commonwealth of Massachusetts, at the offices of
15      Regan & Kiely, LLP, 82 Devonshire Street, Boston,
        Massachusetts, on January 6, 2006, commencing at
16      11:00 a.m.
17
18
19
20
21
                            DUNN & GOUDREAU
22            COURT REPORTING SERVICE, INC.
                        One State Street
23                    Boston, MA  02109
                        (617) 742-6900
24



PAUL WILLETT                                                    JANUARY 6, 2006

Page 2

1   APPEARANCES:
2   DAVID F. ANDERSON, ESQUIRE
    LATTI & ANDERSON, LLP
3   30-31 UNION WHARF
    BOSTON, MA 02109
4   TELEPHONE NO. (617) 523-1000
    FOR: PAUL WILLETT
5
    ROBERT E. KIELY, ESQUIRE
6   REGAN & KIELY, LLP
    82 DEVONSHIRE STREET
7   BOSTON, MA 02109
    TELEPHONE NO. (617) 723-0901
8   FOR: E & S FISHERIES, INC.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          (DEPOSITION COMMENCED AT 11:25 A.M.)
2          (EXHIBITS 1, 2, 3, 4, 5 AND 6 MARKED FOR
3          IDENTIFICATION)
4                    PAUL WILLETT
5       The deponent, having been satisfactorily
6    identified and duly sworn by the Notary Public,
7    deposes and testifies as follows:
8              EXAMINATION BY MR. KIELY
9       MR. KIELY: Counsel have agreed to reserve
10   all objections, except as to the form of the
11   question, until the time of trial; and to reserve
12   motions to strike until the time of trial. Did you
13   want -- you don't want a notary or anything like
14   that?
15            MR. ANDERSON: No.
16   Q. Good morning, Mr. Willett.
17   A. Good morning.
18   Q. My name is Bob Kiely and I represent E & S Fisheries
19      in this lawsuit that's been brought on your behalf.
20      I'm going to be asking you some questions this
21      morning about yourself, and about your injury, and
22      some of the things that have happened since the
23      injury. If at any time I ask you a question that you
24      don't hear or you don't understand, can you let me

Page 3

1                I N D E X
2
    WITNESS                              PAGE
3
    PAUL WILLETT
4
       Examination by Mr. Kiely .......... 4
5
6                E X H I B I T S
7   NO.  DESCRIPTION                     PAGE
    (Defendant)
8
9    1   Transcribed Statement of Paul Willett .... 4
10   2   2000 1040 Income Tax Return ......... 4
11   3   2001 1040 Income Tax Return ......... 4
12   4   2002 1040 Income Tax Return ......... 4
13   5   2003 1040 Income Tax Return ......... 4
14   6   2004 1040 Income Tax Return ...... 4
15
     *Reporter's Note:
16
     (Exhibits were retained by Attorney Kiely)
17
18
19
20
21
22
23
24

Page 5

1       know that? And I'll repeat it, or rephrase it,
2    hopefully, in a way that you can understand. Okay?
3    A. Uh-huh.
4    Q. One of the rules -- and your counsel may have told
5       you this. What's going on here is I'm asking you
6       questions, you're giving me answers and the
7       stenographer is taking it all down to create a record
8       of what the questions and answers are. So, part of
9       that has to be that you answer verbally. Because if
10      you look at me and nod your head, I understand you,
11      but it doesn't come out on the record.
12   A. Okay.
13   Q. The same thing applies to uh-hum or, you know,
14      uh-huh, those kinds of things.
15   A. You want yes or no.
16   Q. I want yes or no. But beyond that, I just want
17      verbal answers in general.
18   A. Okay.
19   Q. So, if you could do that, it's tough to remember
20      during the course of a depo, but if you could do
21      that, we'd appreciate it. If you need to take a
22      break at any time during the course of the
23      deposition, let me know, and you can talk to your
24      counsel or take a trip to the men's room, we will

DUNN & GOUDREAU

PAUL WILLETT                                                    JANUARY 6, 2006

---

Page 6

1      accommodate that. Okay?
2  A.  Yes.
3  Q.  Can you state full name for the record, please?
4  A.  Paul Willett.
5  Q.  What's your age?
6  A.  Forty-seven.
7  Q.  Date of birth?
8  A.  6/22/58.
9  Q.  Are you married, sir?
10 A.  Presently getting divorced.
11 Q.  But you're currently married?
12 A.  Yes.
13 Q.  What's your wife's name?
14 A.  Nancy Willett.
15 Q.  How long have you been married?
16 A.  Almost five years.
17 Q.  How far along -- and we won't get into this a whole
18     lot, but how far along is the divorce process?
19 A.  Just shy of three months it's been going on.
20 Q.  This is not something that's going to change; the
21     divorce is definitely going to go through?
22 A.  Unfortunately, yeah, I think so.
23 Q.  Do you have any children?
24 A.  No.

---

Page 7

1  Q.  It looks like from what I've been able to tell from
2      the file, you -- strike that. Nancy had two children
3      from a prior marriage?
4  A.  Right.
5  Q.  But you don't personally have any biological
6      children?
7  A.  No. She's got one child now. One passed away.
8  Q.  I'm sorry to hear that. Where do you live right now?
9  A.  At my mother's. 911 Main Street, Acushnet, Mass.
10 Q.  And I take it that that move is because of the status
11     of your marriage?
12 A.  Right.
13 Q.  Where were you living prior to that?
14 A.  67 Sandy Beach Road, Plymouth, Mass.
15 Q.  How long did you live there?
16 A.  Just around five years. In that area, give or take
17     some.
18 Q.  So, around the time of this accident, that this case
19     is about, October of 2003, you were living at the
20     Sandy Beach Road address?
21 A.  Yes, I was.
22 Q.  And you were living at that time with Nancy?
23 A.  Yes, I was.
24 Q.  And you were married at that time?

---

Page 8

1  A.  Yes, I was.
2  Q.  Since 2003, other than the Sandy Beach Road address
3      and the 911 Main Street address, have you lived
4      anywhere else?
5  A.  Not really, no. No.
6  Q.  Why do you say not really?
7  A.  Well, I stay at one of my friend's house once in a
8      while in New Bedford, but that's...
9  Q.  That's just a social thing?
10 A.  No, that's since the divorce. Since I left the
11     house.
12 Q.  What the friend's name?
13 A.  David Poineau.
14 Q.  Can you spell the last name?
15 A.  No. Your guess is as good as mine on that one.
16 Q.  How is it pronounced again?
17 A.  Poineau.
18 Q.  Briefly, if you could, give me a rundown of what your
19     educational history is. Did you go to high school?
20 A.  I went to New Bedford High and then I took all my AB
21     courses, my captain's course.
22 Q.  Back up a little bit. For the record, what type of
23     courses did you take?
24 A.  Courses at Northeast Maritime in Fairhaven, Mass.

---

Page 9

1      After my accident, I went and got retrained.
2  Q.  Well, let's stop for a second. New Bedford High
3      School, did you graduate from New Bedford High
4      School?
5  A.  I didn't graduate. I was in the twelfth grade when I
6      left.
7  Q.  So, you were a senior when you left?
8  A.  Yeah.
9  Q.  Did you drop out?
10 A.  I left to go to work, yeah.
11 Q.  And then after high school --
12 A.  Well, I finished -- go ahead.
13 Q.  After you dropped out in the twelfth grade, you went
14     fishing? Is that the work you went into?
15 A.  No. I went into other work. I didn't go into
16     fishing until '87 or '88, I believe.
17 Q.  We'll get into your employment history in a second.
18     Besides New Bedford High that you completed up until
19     the middle of the twelfth grade --
20 A.  Yes. Uh-huh.
21 Q.  -- where else did you go to school?
22 A.  I took some courses at Peterson's School of
23     Engineering one time for a boiler's license that I
24     didn't do.

---

DUNN & GOUDREAU

PAUL WILLETT                                                                JANUARY 6, 2006

**Page 10**

1  Q. Did you complete that, the Peterson's School?
2  A. Yeah. I never went for my license because it turned
3     out to be something that I didn't want to do.
4  Q. Okay.
5  A. And then I worked numerous jobs until I went fishing.
6  Q. You mentioned a minute ago that you took some
7     maritime courses at some point?
8  A. After I got hurt and I found out they didn't want me
9     to stay fishing, I took my captain's course, my AB
10    papers, my anchorman's license.
11 Q. What's an AB license?
12 A. Able-bodied seaman.
13 Q. But this is all after your 2003 accident?
14 A. Right.
15 Q. Up to the accident in 2003, your only other
16    education, then, had been this Peterson's School?
17 A. Yeah.
18 Q. Did you ever try to go back to high school, or get
19    your GED, or anything like that?
20 A. No.
21 Q. Let's talk about your employment history. When you
22    dropped out of high school, where did you go to
23    work?
24 A. Oh, God, I believe I worked at Acushnet Company for

**Page 11**

1     years.
2  Q. Was that the first job you had out of high school?
3  A. One of the first.
4  Q. If we can do it chronologically, I think that would
5     help. So, that's why I'm asking you if it was your
6     first one after you left high school.
7  A. Let's see, I remember working at Fall River Country
8     Club first in my life. Then, I worked at —
9  Q. When was that? How old were you?
10 A. I was a teenager.
11 Q. Were you still in school then?
12 A. Yeah.
13 Q. So, that was just like a part-time summer job?
14 A. Right. Well, you asked for everything. So, I worked
15    at Fall River Country Club, then I worked at Smith
16    Office Supply. And then, I believe, I went to
17    Acushnet Company.
18 Q. Let's start with when you left school and you started
19    to work full time.
20 A. Probably Smith Office Supply as a truck driver.
21 Q. What year was that?
22 A. When I was 18.
23 Q. You're going to make me do the math? You don't
24    remember what year it was?

**Page 12**

1  A. No.
2  Q. How long did you work for Smith as a truck driver?
3  A. Probably two years.
4  Q. Were you working any other jobs while you were
5     working for them?
6  A. I don't remember. No.
7  Q. By the way, if you don't remember, that's fine. I
8     mean, that's a fair answer. But when you say I don't
9     remember, no —
10 A. I mean, you're going back so far. I mean, this stuff
11    I haven't thought about in years.
12 Q. My point is, if you don't remember, I want you to say
13    I don't remember. I don't want you to say I don't
14    remember and then no, because those are two different
15    answers.
16 A. Okay.
17       MR. ANDERSON: He doesn't really expect you
18    to know the answer to every one of these questions,
19    but he doesn't know what you know or don't know until
20    he asks you. So, just because he asks a question,
21    doesn't necessarily mean that he expects you to know
22    the answer to every one of these questions. So, if
23    you don't know, you don't know. But if you do, tell
24    him.

**Page 13**

1       THE WITNESS: All right.
2  Q. On the other hand, if you can go back in your memory
3     and think about it, that's fair also.
4  A. Okay.
5  Q. Where did you go after you left Smith Office Supply?
6  A. I believe to Acushnet Company.
7  Q. What's Acushnet Company?
8  A. It was part of Titleist, the golf ball division.
9  Q. Sporting goods?
10 A. Rubber products.
11 Q. What did you do for them?
12 A. Ran a press and probably a forklift job.
13 Q. In the factory?
14 A. In the factory, yeah.
15 Q. And you would have started there sometime when you
16    were about 20 years old?
17 A. Right.
18 Q. How long did you stay at Acushnet?
19 A. Probably six years.
20 Q. Was that a union job?
21 A. No.
22 Q. What was your — did you have a job title when you
23    started with them?
24 A. I believe it was press man.

PAUL WILLETT                                                                          JANUARY 6, 2006

Page 14

1   Q.  And that would have included driving a forklift, too,
2       or is that something you did later?
3   A.  Yeah.  It was all like, you know, the general thing
4       you did.
5   Q.  How about when you left, what were you doing when
6       you left?
7   A.  When I left them, I tended bar for a couple of years.
8   Q.  Let me go back for a second to Acushnet Company.
9       What were you making at Acushnet, do you remember?
10  A.  No.
11  Q.  Were you paid by the hour?
12  A.  Yes.
13  Q.  Why did you leave?
14  A.  I didn't want to work there anymore.
15  Q.  And you went to bartending next?
16  A.  Yes.
17  Q.  Where did you bartend?
18  A.  Jimmy's Corner Irish Pub in New Bedford, then there
19      was another place I tended bar called the -- some
20      people -- it was called the Newsroom, and then I ran
21      Mickey McQuade's.
22  Q.  Where was the Newsroom?
23  A.  The south end of New Bedford.
24  Q.  And where was McQuade's?

Page 15

1   A.  McQuade's was on North Front Street in New Bedford.
2       I ran that place for, I believe, two to three years.
3   Q.  These jobs at these three bars and restaurants, were
4       they full-time jobs you had?
5   A.  Yeah.
6   Q.  How many years did you do that?
7   A.  Right from -- from the time I left Acushnet Company
8       until, I believe, '88 and I went fishing.  And then
9       since '88, I've been a fisherman -- '87, '88 I've
10      been a fisherman since then.
11  Q.  So, after leaving the bar employment, you went right
12      into fishing?
13  A.  Right.
14  Q.  What were you making -- was McQuade's the last place
15      you worked?
16  A.  Yes.
17  Q.  What were you making at McQuade's?
18  A.  I can't recall.
19  Q.  Generally?
20  A.  I don't know.  5 to $700 a week, probably.
21  Q.  You said you were running McQuade's.  So, it was more
22      than just bartending?
23  A.  I was actually on the liquor license and I ran it as
24      a manager and I tended bar.

Page 16

1   Q.  How long were you at McQuade's as a manager?
2   A.  I ran it for probably two years.
3   Q.  Any particular reason you left McQuade's?
4   A.  I just wanted to go fishing.
5   Q.  I mean, was there any particular reason you wanted to
6       do something different?  I mean, did you think you
7       could make more money, or?
8   A.  Yeah.
9   Q.  Was that the same reason why you left Acushnet, you
10      thought there were better opportunities, more money
11      to be made elsewhere?
12  A.  Yeah.  Just keep -- you know, yeah.  As you get
13      older, you move on.
14  Q.  Sure.  Obviously, being from the New Bedford area,
15      you knew about fishing, but how did you come to get
16      into fishing as a job?
17  A.  I have a lot of family members that have been
18      fishermen.
19  Q.  Your father?
20  A.  My father fished, my uncles fish, my brothers fish.
21  Q.  And they still fish?
22  A.  Just my brother.
23  Q.  What was the first fishing job you had?  I know you
24      said it was '87.

Page 17

1   A.  I believe fishing vessel BERNIE C.
2   Q.  Do you know who owns that or owned it?
3   A.  Donald Callahan.  Callahan, Callaghan, something like
4       that.
5   Q.  Is the BERNIE C still fishing?
6   A.  I have no idea what happened to that boat.
7   Q.  What kind of fishing was it?
8   A.  Scalloping.
9   Q.  How many years did you fish on the BERNIE C?
10  A.  I don't know.  A year or two.
11  Q.  Were you fishing on other boats at the same time or
12      were you just on that?
13  A.  No.  I fished on other boats during that time, too.
14  Q.  But the BERNIE C gave you your first fishing job?
15  A.  Yes.  Uh-huh.
16  Q.  Who else did you fish for over the years before you
17      started working on the LIBERTY, the vessel that's
18      involved in this accident?
19  A.  Let's see, I fished on the JANICE & JULIE, the TEXAS,
20      the NICOLE & ELIZABETH, LET IT RIDE, IT AIN'T EASY,
21      the SETTLER, the WARRIOR.  There's got to be five or
22      six other boats, too.
23  Q.  All scallopers?
24  A.  Yes.

DUNN & GOUDREAU

PAUL WILLETT                                                                    JANUARY 6, 2006

Page 18

1   Q.  Just for the sake of shortness, did you ever do any
2        other kind of fishing other than scalloping?
3   A.  No.
4   Q.  Aside from all the different boats that you worked
5        on, were there particular owners or captains that you
6        worked for frequently during your fishing career up
7        to the time you went on the LIBERTY?
     A.  I was on the JANICE & JULIE for quite a few years.
     Q.  Who was that with?
10  A.  That was with William Gallant.  And I fished a lot
11       with Eric Paiva, who was one of the other captains, a
12       lot with him.  And then, I fished with my brother a
13       lot; and then, with other guys I would just, you know
14       -- you know, when they needed a mate, I'd go as a
15       mate.
16  Q.  What's your brother's name?
17  A.  Michael Willett.
18  Q.  Does he own a boat?
19  A.  Yes.  He owns a couple of boats.
20  Q.  What does he own?
21  A.  IT AIN'T EASY, LET IT RIDE, and -- shucks, the third
22       one's right on the tip of my tongue.
23  Q.  If you think of it, let me know.
24  A.  Okay.

Page 19

1   Q.  Over the years that you've been on fishing boats,
2        what positions have you held?  Have you always been a
3        deck hand?
4   A.  No.  Mostly, in the wheelhouse.  Mostly, mate.
5   Q.  Have you ever been a captain?
6   A.  No.
7   Q.  Now, in October of 2003 you were working on the
8        LIBERTY, correct?
9   A.  Right.
10  Q.  I don't mean on the same trip, but I mean in the same
11       period of time were you working on any other boats on
12       any kind of consistent basis?
13  A.  No.  Right then I was working for E & S Fisheries at
14       that time.
15  Q.  So, would it be fair to say during all of 2003 you
16       were working just for E & S?
17  A.  No.  I think in July or August I started with E & S.
18  Q.  Okay.  And to your knowledge, E & S Fisheries only
19       owns the LIBERTY, or do they own any other boats?
20  A.  I fished on the VENTURE, I believe.
21  Q.  I think that's right, yes.
22  A.  And there's one other boat.  It used to be -- that
23       one's on the tip of my tongue, too, the name of it.
24  Q.  But at least to your understanding, the VENTURE and

Page 20

1        this other boat are also --
2   A.  I believe Danny owns three boats.
3   Q.  When you say "Danny," do you mean Dan Arletson?
4   A.  Yes.
5   Q.  So, you started working on the LIBERTY in August of
6        2003?
7   A.  Yeah, but I had worked for him before.  I believe one
8        or two trips with Eric Paiva, I ran a watch with
9        Eric.  I believe it was one or two trips.
10  Q.  On the LIBERTY?
11  A.  No.  I believe that was the VENTURE.  The year before
12       or something I remember working over there.
13  Q.  You think it was sometime in 2002?
14  A.  Something like that, yeah.  I forget whether it was
15       one or two trips I fished with Eric.
16  Q.  Is he the captain of the VENTURE?
17  A.  He was the captain then, yes.
18  Q.  Who was the captain of the LIBERTY when you went to
19       work on the LIBERTY?
20  A.  Tommy Nichols.
21  Q.  To your knowledge, is he still the captain?
22  A.  Yes.
23  Q.  Now, before you went to work for E & S Fisheries,
24       either on the VENTURE or on the LIBERTY, did you know

Page 21

1        Dan Arletson?
2   A.  Probably just to say hi to, you know.
3   Q.  An acquaintance?
4   A.  Yeah.  I mean, I'd see him around and I'd say hi.
5        I'd be with Eric a lot and we'd stop by and talk to
6        him, because Eric was a captain, but I guess when I
7        made the first trip on the VENTURE is when I really
8        met him.
9   Q.  How about Tom Nichols, did you know Tom?
10  A.  I've known Tommy for years.
11  Q.  Would you say you were personal friends before you
12       went to work for him?
13  A.  I would say -- I never called his house or anything
14       else, but I would see him around and we'd talk, you
15       know.  I knew his wife from high school.
16  Q.  She went to New Bedford High with you?
17  A.  Right.
18  Q.  How about Tom?
19  A.  No.  He's from New Jersey, I believe.
20  Q.  How did it come about that you went to work on the
21       LIBERTY?
22  A.  I went and asked for a job.
23  Q.  Any particular reason you were switching?
24  A.  No.  I wanted to get on that boat.  It was a big

DUNN & GOUDREAU

PAUL WILLETT                                                JANUARY 6, 2006

---

**Page 22**

1    boat, a good winter boat.
2  Q.  And we're talking about the LIBERTY, not the VENTURE?
3  A.  Right.  Right, because -- yeah, because -- actually,
4      I was going to go over there and work for Eric,
5      running a watch, but I ended up with Tommy for -- I
6      don't know what reason.  And when I got over there, I
7      liked working with Tommy.
8  Q.  The LIBERTY is a 12-month-of-the-year boat?
9  A.  They all are.  It's just a big boat.  The bigger, the
10     better.
11 Q.  During the years when you were a fisherman on these
12     scallop boats that you've mentioned, did you ever
13     have any kind of -- I don't mean any injury,
14     obviously, you can cut your finger.  Did you have any
15     serious injury that you received medical attention
16     for?
17 A.  I broke a rib one time.
18 Q.  When was that, roughly?
19 A.  Five years ago.  And then I got -- and then I was
20     running a watch with Eric Paiva and I got hit in the
21     face with the main wire.
22 Q.  On what boat was that?
23 A.  On the NICOLE & ELIZABETH.
24        MR. ANDERSON:  I don't mean to interrupt

---

**Page 23**

1      you, but some of these things are in the
2      interrogatories.
3        MR. KIELY:  Prior injuries?
4        MR. ANDERSON:  Yes.  I mean, we did go
5      through it.  They're not done yet, but if you want to
6      take a look through it.
7        MR. KIELY:  Always trying to make my life
8      easier, Dave.
9        MR. ANDERSON:  Well, no, it's just that,
10     you know.  We didn't hit negligence and we haven't --
11     it might just speed things along.
12       MR. KIELY:  That's fine.  Let's take a
13     break for a second.
14        (BRIEF RECESS)
15 Q.  Sir, you mentioned the broken rib and the injury,
16     was it to your eye, or face --
17 A.  Yeah, face.
18 Q.  -- from wire?  Anything else that you can think
19     of?
20 A.  Nothing that I went to the hospital for, but, you
21     know, you get banged up with that kind of job.
22 Q.  Sure.  Okay.
23 A.  I believe those were the only two times I went to the
24     hospital.

---

**Page 24**

1  Q.  Okay.  And during your time on either the VENTURE or
2      the LIBERTY, before this incident in October of '03,
3      you hadn't been injured on either of those boats?
4  A.  No.
5  Q.  Okay.  During the years 2000 through 2003, we'll
6      limit it to that for the moment, did you have any
7      other sources of income?  You, personally.  I'm not
8      talking about your wife, I just mean you.  Did you
9      have any other sources of income other than your
10     fishing income?
11 A.  I -- not really.  I mean, I sell like exotic cowboy
12     boots and shoes, but I really don't make any money on
13     it.  It's just a hobby of mine.
14 Q.  And you've given me tax returns, we'll get to those
15     before we finish, but would it be fair to say that
16     the income that shows up on that as attributable to
17     you, that's your income for those years?
18 A.  Yeah, I believe so.  Yeah, I think so.
19     Everything's...  I'll see it when I see what you've
20     got.
21 Q.  Yes.  Fair enough.  You were diagnosed with diabetes
22     in 1996; is that correct?
23 A.  I would say around there, yeah.
24 Q.  Late '90s, mid to late '90s, somewhere in that range?

---

**Page 25**

1  A.  Late '90s probably.
2  Q.  How did that come about?
3  A.  How did that come about?
4  Q.  I mean, were you not feeling well and you went to get
5      it checked out?
6  A.  I went for a checkup and then I found out I had it.
7  Q.  And as a result -- well, tell me what exactly did
8      they tell you you had.
9  A.  A Type 2, I believe, and it was controlled by diet and
10     pills.
11 Q.  What pills did they give you?
12 A.  Oh, God, I can't remember the names.
13 Q.  Are you still taking it?
14 A.  Right now I'm on insulin.
15 Q.  But initially, when you were diagnosed, they didn't
16     put you on insulin?
17 A.  No.  I didn't have a problem with it.  I never had a
18     problem until after the accident.
19 Q.  And you don't recall the medicine that they gave
20     you?
21 A.  No.
22 Q.  Who treated you -- who was your regular treating
23     physician that you saw for your diabetes?
24 A.  Dr. Piva.  He had been my physician for years.

---

DUNN & GOUDREAU

PAUL WILLETT                                                                JANUARY 6, 2006

**Page 26**

1  Q. And that didn't change after your diagnosis?
2  A. No.
3  Q. He didn't send you to any specialists for further
4     treatment or anything like that?
5  A. No. I didn't get a specialist for my diabetes until
6     after the accident.
7  Q. How do you spell Dr. Piva's name, do you know?
8  A. P-I-V-I-A (sic), I believe. I could be wrong. It's
9     something like that.
10 Q. Where is he based? Where is his office?
11 A. Fall River.
12 Q. Right in the city there?
13 A. Yes. Up on North Main Street now.
14 Q. How often do you see him?
15 A. I started seeing him just recently, but I don't see
16    him as much as I see my doctor in Plymouth. Since
17    I'm moving back up to New Bedford, I'm going to move
18    my doctor now because, you know...
19 Q. I understand. When you were down in Plymouth, you
20    got a new --
21 A. I was with Dr. Coakley.
22 Q. He or she?
23 A. He.
24 Q. And Dr. Coakley's in Plymouth?

**Page 27**

1  A. Right. He's an anacologist (sic), oncologist (sic)
2     or whatever it is. A sugar doctor.
3  Q. And you were seeing Dr. Coakley specifically for
4     your diabetes issues?
5  A. Because -- since the accident, yes.
6  Q. How long have you been on insulin?
7  A. They put me on insulin, I believe -- while I was in
8     the hospital in Fall River, after my foot got
9     infected. They couldn't -- I couldn't get my
10    sugar to come down because of all the medicines I was
11    on.
12 Q. So, are we talking sometime in November or December
13    of '03?
14 A. Probably December. I'm getting off insulin probably
15    Monday, because I've finally got everything back. It
16    takes a long time for your readings to go down and
17    now I'm going back on the pill, hopefully, Monday.
18 Q. Good. Prior to your going on insulin, you mentioned
19    something about controlling your diabetes with diet.
20    Was that a program that a doctor had put you on?
21 A. No. My sugar -- when I got hurt, my weight was down.
22    And with my pill a day, I had absolutely no problem
23    with my sugar.
24 Q. I understand what you're saying. I mean, you said

**Page 28**

1     after you were diagnosed, they didn't put you on
2     insulin. Did they suggest any kind of program or
3     dietary regimen?
4  A. Oh, yeah, you have to -- you know, you have to pay
5     attention more, you know, to what you eat when you
6     have sugar. And now that I'm over my stuff, I'm
7     going to be off all my sugar medicines.
8  Q. Before the accident, when you still weren't on
9     insulin, had your doctor given you some sort of a
10    target weight that you were supposed to maintain?
11 A. I believe I was like 230 when I got hurt. And when
12    I'm around that weight, I have absolutely no problems
13    with my sugar.
14 Q. And when you say "my sugar," you mean your blood
15    sugar levels?
16 A. Right.
17 Q. Blood glucose levels?
18 A. Right. I guess -- yeah. I've never had real
19    problems with it. It's there in the family. That's
20    all it was was a little -- you know, one pill a day.
21 Q. Your father had it, too?
22 A. Yeah.
23 Q. Your brother?
24 A. One of my brothers has it.

**Page 29**

1  Q. Anyone else in your family?
2  A. I think maybe an aunt had it.
3  Q. You said at the time of the accident you weighed
4     230?
5  A. I was -- for me I was, you know, thin for me at the
6     time of the accident.
7  Q. And I'm not trying to put -- if you're not sure what
8     you weighed, that's fine.
9  A. Right. I'm not exactly sure what I weighed, but I
10    know I was -- I remember -- I just remember I was --
11    I remember I had taken off a lot of weight just
12    before then, too.
13 Q. How tall are you?
14 A. Six-one.
15 Q. What do you weigh right now?
16 A. Probably 250, 248. Right in that area.
17 Q. And now that you're seeing a doctor frequently for
18    your diabetes issues, that's something that they keep
19    a watch on? What your weight is?
20 A. Yeah, they weigh me. It's -- yeah, they weigh me and
21    then they take my blood work and I control it by what
22    I do. I wouldn't be coming off the insulin if I
23    wasn't doing everything right.
24 Q. You mentioned you think you're coming off it on

DUNN & GOUDREAU

Page 30

1   Monday, is there a particular -- why that particular
2   day? Is that another appointment you have set up?
3   A. I'm trying to get an appointment on Monday; and if
4   not -- if I can get it on Monday, I might be able to
5   get it on Monday, and I know I'll come off Monday.
6   Q. Is this something you've been discussing with the
7   doctor?
8   A. Yes, for a long time.
9   Q. And this is now -- you've reached a point now where
10  they're comfortable taking you off it?
11  A. Right.
12  Q. And that's what they've told you?
13  A. Right.
14  Q. Let's talk a little bit about your time on the
15  LIBERTY. I think you already told me you started,
16  you think, in August of 2003, or thereabouts?
17  A. Thereabouts.
18  Q. Describe the LIBERTY for me in general terms. How
19  big a boat is it?
20  A. I believe she's 106 at the waterline, give or take a
21  few feet.
22  Q. And you mentioned, at least in your estimation,
23  that's a big boat?
24  A. It's one of the better sized boats in New Bedford.

Page 31

1   Q. What does she usually go out with in terms of a crew?
2   A. Seven.
3   Q. And the captain at the time you started in August was
4   Tom Nichols?
5   A. Yes.
6   Q. What was your job when you started on the LIBERTY?
7   A. Deck hand.
8   Q. Was that different than what you had been used to
9   doing?
10  A. I mostly had been in the wheelhouse for years, yeah.
11  Q. Is there a money difference there?
12  A. Just a per.
13  Q. Can you explain that for me?
14  A. Now, they -- well, they don't call it -- it's not
15  like it used to be, a per. It's so many percent of
16  the total share you get. I mean, I forget what it
17  is. It's 1 percent or something like that, that's
18  your bonus for being mate.
19  Q. So, conceivably, you'd be making less money working
20  as a deck hand than you would in the wheelhouse?
21  A. Yes, but I had opportunities to go in the
22  wheelhouse. I was just -- I had been in the
23  wheelhouse for so many years, I didn't mind being on
24  deck for a little while.

Page 32

1   Q. If a boat was making more money, you could
2   conceivably do better as a deck hand on one boat than
3   as a mate on another boat?
4   A. Right. With only seven men, there's really no
5   difference. Whether you're in the wheelhouse or
6   you're not, it doesn't mean anything. You do the
7   same work.
8   Q. So, you had no problem going on as a deck hand?
9   A. No.
10  Q. Can you describe for me in general terms what the
11  duties are of a deck hand on a scallop boat?
12  A. You...
13  Q. Particularly, as it applied to your time on the
14  LIBERTY.
15  A. You maintain the gear, you know, you pick and cut
16  scallops, and then you take care of, you know -- just
17  your daily jobs.
18  Q. I know it's basic to you because you've been doing it
19  for so long, but we're creating a record, so that
20  we're all clear as to what these jobs entail. I
21  understand taking care of the equipment, and that's
22  something you usually do -- well, I'm sure you
23  probably do it during the trip as well, but mostly
24  that's done before you go out, correct?

Page 33

1   A. It done before you go out; and as things break or get
2   worn out, you repair it.
3   Q. As-needed basis?
4   A. As-needed, yeah. You clean up the boat when you're
5   done with the trip. You help on the inside, in the
6   galley when it's the end of a watch.
7   Q. Let me ask you this, was there anything different
8   about the way the LIBERTY did things than other boats
9   you had been on in terms of your job as a scalloper?
10  A. Every boat's different in its own way.
11  Q. Anything stand out in your mind with regard to how
12  the LIBERTY operated?
13  A. No. It was basically, you know, working for the same
14  purpose.
15  Q. How long were the trips usually on the LIBERTY?
16  A. I believe we did some closed-area trips and I believe
17  we did some long trips.
18  Q. What's the closed-area trips?
19  A. When you go in the closed area, you know, the areas
20  that are zoned off by the government. Some of those
21  trips could have been 6 or 7 days; and the long trips
22  could have been 15 or 16 days.
23  Q. Closed-area trips, though, that doesn't mean you're
24  not supposed to be in there?

PAUL WILLETT                                                    JANUARY 6, 2006

Page 34

1   A.  No.  You have to -- they have to apply to --
2   Q.  It's limited?
3   A.  Yeah.  Limited-access trips, that's what I mean.
4   Q.  Okay.  How many trips did you make before this
5       October 2003 trip on the LIBERTY, if you recall?
6   A.  I think five to six, or four to six.
7   Q.  So, from August to October you made somewhere between
8       four to six trips?
9   A.  Something like that.
10  Q.  That seems pretty active; is that normal?
11  A.  Well, my first trip over there wasn't on the LIBERTY,
12      it was on the JUSTICE.  That's his other boat.
13  Q.  The JUSTICE?
14  A.  Yeah.  The first trip I made over there was on the
15      JUSTICE.
16  Q.  And that's Dan Arletson's also?
17  A.  Yeah.  And I believe Tommy and Eric -- Eric's got the
18      VENTURE, Tommy's got the LIBERTY, and they share the
19      JUSTICE, the days on the JUSTICE.
20  Q.  To the best of your recollection, how many trips did
21      you make on the LIBERTY itself?
22  A.  Then it would cut it down by one trip, four to five.
23  Q.  All right.  So, three to five, somewhere in that
24      range?

Page 35

1   A.  Right.  Something like that.
2   Q.  Getting back to your duties as a deck hand on a
3       scallop boat, and particularly, what you did on the
4       LIBERTY, what would you do once you were out
5       scalloping?  What was your day-to-day routine?
6   A.  You'd get up early, cut scallops.
7   Q.  Was there a night watch as well as a day watch?
8   A.  Yeah.  We ran 8 and 8's, but you'd come out at least
9       an hour -- I believe it was an hour earlier.  I'd get
10      up early to start cutting.
11  Q.  Just to get real basic.  They pull up the scallops in
12      the net and they dump them on the deck?
13  A.  Right.
14  Q.  And then you as a deck hand -- someone would be
15      operating a winch to do that, I take it?
16  A.  Right, up in the wheelhouse.
17  Q.  And then you as a deck hand, once they dumped them
18      out, then you'd start cutting?
19  A.  Well, you...
20  Q.  Pick a pile?
21  A.  Most of the time on the LIBERTY we shoveled.
22  Q.  Describe that.
23  A.  You'd have a bunch of totes, fish totes, probably
24      three-and-a-half to four -- three-and-a-half feet

Page 36

1       long and about two feet wide.
2   Q.  That's like a container?
3   A.  Right.  And most of the time we'd shovel whatever we
4       caught right into the totes and we'd load up probably
5       about 20 totes each side, 15 to 20 totes each side.
6   Q.  So, a port watch and a starboard watch?
7   A.  Right, and then you'd fill up the boxes.  You'd fill
8       up the boxes first, then you'd fill up all the totes,
9       and then a lot of times we would just lay and cut.
10  Q.  What's the difference between the boxes and the
11      totes?
12  A.  The totes -- you shovel the scallops into the totes
13      on deck and the boxes are where you cut them.
14  Q.  So, you carry the totes over to the cutting box?
15  A.  Right.
16  Q.  Was there an inside area where the cutting box was?
17  A.  Yes.
18  Q.  And you wash them at the same time; is that how it
19      works?
20  A.  After you cut them, you wash them.
21  Q.  But that's all in that same area?
22  A.  Right.
23  Q.  How heavy are those totes?  How much would you load
24      them up before you'd carry them over?

Page 37

1   A.  I'd say -- it's been a long time.  I'd say anywheres
2       from 50 to 70 pounds.  I mean, depending on what we
3       were fishing in, if there was a lot of sand, gravel
4       and all that stuff sometimes.  Depending on where you
5       were fishing.
6   Q.  And you'd just pick them up with handles and walk
7       them over to the box?
8   A.  You'd pull them into like a staging area, I guess you
9       could call it.  And then once you had them over
10      there, once you emptied out the cutting box, you and
11      whoever you were working with would load the boxes.
12  Q.  Was there one of these stations on each side of the
13      boat, port and starboard?
14  A.  Yes.
15  Q.  Was there one area where you worked more consistently
16      when you were on the LIBERTY?
17  A.  Port side.
18  Q.  Who did you work with -- well, let me ask you this.
19      The three or four trips that you took on the LIBERTY,
20      was it the same crew each time?
21  A.  Right.
22  Q.  I've got the settlement sheets, I believe, from the
23      trip in October.  I don't currently have settlement
24      sheets from the trips before that for the LIBERTY.

DUNN & GOUDREAU

Page 38

1    Was there any difference in the crew?  If I have
2    settlement sheets that show what the crew was on that
3    October trip where you claim to have been injured, is
4    that going to be a different crew than the prior
5    trips you were on?
6  A.  80 percent of it was the same guys.  There was, I
7    believe -- I believe there was -- two or three of the
8    trips there was one guy -- Jimmy Botelho worked with
9    us, I believe one time, and this Mexican kid,
10   Armando, worked with us one time, and there could
11   have been another guy or two.  You know, a lot of
12   times you get a different -- six of the guys -- five
13   of the guys were pretty regular and there was one guy
14   there that could have changed a couple of times.
15 Q.  And to your knowledge, those guys that were pretty
16   regular, had they been on the LIBERTY for a while
17   before you started?
18 A.  I believe Tommy and three other guys had been there
19   for years.
20 Q.  Do you know those three other guys specifically that
21   had been there for a while?
22 A.  Rick, Jose, and Cully.
23 Q.  Is that a nickname?
24 A.  Yeah.  And then, the other two guys that were there

Page 39

1    were a Vietnamese guy they called Lam and another
2    Vietnamese guy they called Mikey.
3  Q.  You think those were the guys that came in and out a
4    little bit more frequently?
5  A.  Lam -- I believe Lam was there all except the last
6    trip I was there, and I think Mikey was there every
7    trip I was there.  They changed -- there's one guy
8    that comes and goes every so often.
9  Q.  Now, when you would pick up the scallops and carry
10   them over to that staging area that you talked about,
11   what was the next step that you did?
12 A.  You'd shovel the scallops into the tote, drag the
13   totes over to just outside the door, and you'd stack
14   them up and then you'd fill up the box.  And then
15   when everything was full, you'd start cutting.
16 Q.  And then what do you do with the remnants from when
17   you're cutting, is there somewhere you throw that?
18 A.  When you cut a scallop, you cut it and you throw it
19   down -- there's a chute on the other side of the box;
20   that goes down the chute and it's forced out by
21   water.
22 Q.  Off the deck and into the water?
23 A.  Right.
24 Q.  Was there anyone that you worked with particularly on

Page 40

1    your side -- you said port side you were on, right?
2  A.  Uh-huh.
3  Q.  I'm sorry, you've got to say yes for the record.
4  A.  Yes, I'm sorry.
5  Q.  Was there a set port side crew?
6  A.  I would mostly work with Mikey.  He was the --
7  Q.  Vietnamese guy?
8  A.  Little Vietnamese guy.  He was there the first half
9    of my watch.  Like, say we got on deck at 8 in the
10   morning, he'd be there until, I believe, 1.  I'd have
11   Mikey from 8 to 1, or 8 to 12, I forget what it was.
12   And then Lam would be there for the first hour or so
13   I got up.  He was on the other watch.
14 Q.  Were those guys good deck hands, in your estimation?
15   Did you have any problem with them?
16 A.  Lam, no problem.  Mikey was -- I didn't care for him
17   at all.  He was too small and too weak.
18 Q.  So, it's fair to say he had a problem humping that
19   50 to 70 --
20 A.  A very big problem.  It was almost heavier than he
21   was.
22 Q.  Aside from that, his size and relative strength, any
23   other problems you had with him?
24 A.  Verbally, no.  He was just terribly weak.

Page 41

1  Q.  No, I don't mean problems like he got into any
2    fights with him.  I just mean with the way he
3    conducted his job as a deck hand?
4  A.  Yeah, he didn't know his job at all.
5  Q.  What effect, if any, did that have on you?
6  A.  Working with him made my job a lot harder.  I
7    actually liked it when he went to bed because then
8    I'd work with Jose -- me and Jose would load the
9    boxes.  Mikey was useless.
10 Q.  When you say "made your job harder," it just gave you
11   more to do?
12 A.  Yeah, because he was a very weak person.
13 Q.  How about the other members of the crew, did you make
14   any observations about their abilities as deck hands?
15 A.  All of them were decent men on a boat.
16 Q.  Other than Mikey?
17 A.  Yeah, Mikey was useless.
18 Q.  Did you ever talk to Captain Nichols about that, or
19   Dan Arletson?
20 A.  No.  They knew he was a very weak person.  It was
21   general knowledge.  I mean, he had a hard time
22   putting bags away, he had a hard time down in the ice
23   hole, he had a hard time taking -- he made life hard
24   on people.

**Page 42**

1   Q.   Let's talk about the October trip. What do you
2      recall about the trip?
3   A.   We were laying and cutting. It was --
4   Q.   Where were you, first of all?
5   A.   I believe we were 60 to 70 miles off Point Pleasant
6      in Jersey. I was on deck, so I'm not sure exactly
7      where we were.
8   Q.   I understand, but that's a general vicinity?
9   A.   I believe so, yeah.
10   Q.   Put it this way, had you been down that way with the
11      LIBERTY before?
12   A.   We had fished in quite a few different places, but we
13      could have been down there on one of the other -- I
14      forget exactly, because I know one time we were at
15      the edge, and then we were down at this other place,
16      so we had been to the southern a couple of times, I
17      believe.
18   Q.   How far into the trip were you?
19   A.   Four or five days, I believe. Five days.
20   Q.   And this was one of those longer trips that you
21      mentioned as opposed to one of the closed-area
22      trips?
23   A.   I believe we were on -- an open-access trip it was
24      going to be. So, I don't believe we were in a closed

**Page 43**

1      area, because there would have been -- I believe it
2      was an open-access trip.
3   Q.   You mentioned that at the time you believe you were
4      injured, you were laying and cutting?
5   A.   Yes, we were.
6   Q.   What's the laying part of that? I think I get the
7      cutting. What are you referring to when you say
8      laying?
9   A.   The drags were at the gallows. The drags were up on
10      the side of the boat, just hanging there. The engine
11      was shut down and out of gear. I believe the engine
12      was shut down that morning. They usually shut it
13      down when we lay and cut.
14   Q.   Does that make any difference with regard to what
15      you're doing?
16   A.   That means there's plenty of scallops. There's big
17      piles of scallops on the boat.
18   Q.   More work for the deck hands, in other words?
19   A.   More work for everybody when you've got a lot of
20      scallops.
21   Q.   Tell me what you recall happening with regard to your
22      injury.
23   A.   I remember being on deck with Mikey that morning and
24      it was --

**Page 44**

1   Q.   Was it light?
2   A.   I believe it was daytime. I believe -- I'm not
3      exactly -- I believe it was -- it was the daytime
4      watch. I believe we set out midmorning, around
5      noontime or something because there was two of us
6      that were on deck. So, he was still on deck with me,
7      I believe, when we flared them out. I went on the
8      side that I would flare out and he went to the side
9      that he would flare out.
10   Q.   And you had pulled the scallops back on and now you
11      were cutting?
12   A.   We had the drags at the gallows, the deck was loaded,
13      all the totes were loaded, and then we loaded --
14      then, before we went to set out, we almost got
15      everything cut out, all the totes, all the boxes. We
16      reloaded the totes, we reloaded all the boxes. We
17      got everything done. I guess prior to that they
18      started the engine up again. And once we got
19      everything all loaded up and everything, that's when
20      Tommy put her in gear and got back on the tow; and
21      that's when he rang the horn, the buzzer, whatever
22      you want to call it, for us to flare the drags.
23   Q.   And what happened next?
24   A.   When he did that, we -- I forget. You know, they

**Page 45**

1      called it the hailer or whatever. When he did that,
2      that's when I ran across the deck, you know, because
3      you try to go as fast as you can to do stuff, because
4      that's how the job is; and that's when I felt the big
5      stab in my foot, you know, the -- something's gone
6      through on the top -- on my toe there.
7   Q.   And for the record, we're talking about your left
8      foot?
9   A.   Right.
10   Q.   And the second toe next to the big toe on your left
11      foot?
12   A.   Right.
13   Q.   Or that might be deceiving. The toe next to your big
14      toe?
15   A.   Right.
16   Q.   What were you wearing at the time?
17   A.   I had sweat pants. I think sweat pants on or long
18      johns on. I used to wear like shorts with long johns
19      and black leather boots, then a pair of oiler pants,
20      and then probably -- I can't remember if it was cold
21      or not that day -- a half sweat shirt or something
22      on; or if it was cold, I had a hood on. I don't
23      remember whether it was cold.
24   Q.   The black rubber boots, you mentioned, were those

PAUL WILLETT
<span style="float:right">JANUARY 6, 2006</span>

Page 46

1    your boots?
2  A.  Yes.
3  Q.  So, the equipment that you brought on at least --
4      well, strike that. The black rubber boots you were
5      wearing were yours?
6  A.  Right.
7  Q.  And then you also mentioned you had oilskins?
8  A.  Yes.
9  Q.  Were those yours as well?
10 A.  Yes.
11 Q.  And all the clothing that you described to me, that
12     was yours, too?
13 A.  Yeah.
14 Q.  So, if we can call that your equipment, that
15     equipment, that's something that you brought onto the
16     boat with you?
17 A.  Yeah.
18 Q.  None of that was given to you by the LIBERTY?
19 A.  No.
20 Q.  How long had you had the boots?
21 A.  I believe they were fairly new, a trip or two.
22 Q.  The same kind you always use?
23 A.  Yeah. There's like only two kinds they use.
24 Q.  Do you remember the brand name, or the type?

Page 47

1  A.  I don't remember whether they were the black ones or
2      the brown -- it was one of the better pairs you buy.
3      I forget which brand they were.
4  Q.  How high do the boots go?
5  A.  Probably midcalf.
6  Q.  And those are the ones you always wear?
7  A.  Uh-huh. Yes, sorry about that.
8  Q.  What about the oilskins? Do they come down over the
9      top of the boot?
10 A.  Right.
11 Q.  So, you don't tuck them into the boot?
12 A.  You don't tuck them into the boot. They go on the
13     outside of the boot. And then, I would fold them
14     over and I had two elastic bands, so the water don't
15     run up your boots.
16 Q.  You did that all the time?
17 A.  Right.
18 Q.  That was your regular practice?
19 A.  Right.
20 Q.  And on the day that you felt this jab -- we'll call
21     it a jab; is that fair?
22 A.  Yeah.
23 Q.  You had yourself dressed like that?
24 A.  Right. And I remember I had oilers on that day

Page 48

1      because sometimes I would just use an apron if it was
2      nice out, but it must have been a little cold that
3      day.
4  Q.  What's the difference between the two, by the way?
5  A.  An apron just hangs around your neck and goes around
6      you. And then, you know, it goes down to about
7      midcalf.
8  Q.  Like a regular apron?
9  A.  Yes. Just like a regular apron, but it's made out of
10     the same material as the oilskins.
11 Q.  So, in the warm weather, you don't want to put pants
12     on, you just want the apron?
13 A.  Yes.
14 Q.  And you wear it with the boots?
15 A.  Yes.
16 Q.  But you're pretty certain you had the oilskin pants
17     on?
18 A.  I believe so, yeah.
19 Q.  You said you were in the process of running or
20     walking real quickly to another part of the boat when
21     you felt it?
22 A.  Uh-huh. From the -- yes, from the cutting box to the
23     stern.
24 Q.  Okay. And what were you going to do when it

Page 49

1      happened?
2  A.  I was going to flare the drag.
3  Q.  And just quickly explain what that means.
4  A.  Flaring the drag means getting the drag so -- getting
5      the drag ready to set out.
6  Q.  You were walking down the port side?
7  A.  I went from the port side to the starboard side,
8      because I'd go across the deck. I'd go from the port
9      box to the starboard box. And Mikey would go
10     straight to the port side because he wasn't -- he
11     could never flare the starboard side because he was
12     too short. Half the time, I'd have to flare both
13     sides because he was too short.
14 Q.  In any case, you were on your way -- had you gotten
15     to the starboard side, or were you on your way to the
16     starboard side?
17 A.  I was on my way.
18 Q.  What was on the deck as you were walking across?
19 A.  Piles of scallops.
20 Q.  Is that unusual?
21 A.  Not when you're laying and cutting.
22 Q.  Which is what you were doing?
23 A.  Right. You'd have to climb -- a lot of times you'd
24     have to climb over piles. I guess we had pretty good

Page 50

1    size piles.
2    Q.  What was the deck on the LIBERTY?  Is it the tiles,
3       the nonskid tiles, standard?
4    A.  I believe when you step out of the cutting box --
5       inside had nonskid tiles, maybe the first 6 feet
6       outside the door had nonskid tiles.  Then, it had an
7       oak planked deck, you know, from the strongback out.
8       And then, the last 10 or 8 feet of the deck was just
9       plain steel until you get to the rail.
10   Q.  The part of the deck where you were walking when you
11      felt that, what was the surface there, if you know?
12   A.  Oak plank.
13   Q.  When you felt that jab in your foot, what did you
14      do?
15   A.  It hurt a lot, but I just -- I felt it jab me real
16      hard.  I ran over and I finished flaring the drag.
17      And then, I went and sat on -- after I flared the
18      drag, I went and sat on the strongback, undid my
19      elastics, took my boot off, took my sock off, wiped
20      my foot down.  And then, I shook my sock out and then
21      I got dressed as quick as I could so I could go back
22      to work.
23   Q.  You did that right there on the deck?
24   A.  Right there on the deck.  Right in the middle of the

Page 51

1    deck.  I sat on the strongback after I flared the
2    drag.
3    Q.  That jab that you felt, had you ever felt that
4       before?
5    A.  No.
6    Q.  When you, as you described, took your boot off and
7       then took your sock off, what did you see?
8    A.  I just -- I really didn't look for anything.  I just
9       wiped my foot off and shook my sock out real good.
10   Q.  Did you check to see whether there was something in
11      your boot that you might have jammed your toe into or
12      stepped on?
13   A.  When I took my boot off, I took my boot off and
14      turned it upside down and banged it to make sure
15      there was nothing there.  After I did all that, I got
16      dressed back up -- you know, I put myself back, you
17      know, together and went right back to work.
18   Q.  When you did that with your boot, when you shook it
19      out, banged it, did anything fall, or did you see
20      anything?
21   A.  Yeah.  There was like shells and dirt and that kind
22      of stuff that came out.
23   Q.  So, when you shook your boot, you did get something
24      that fell out?

Page 52

1    A.  Yes.
2    Q.  What exactly did you see that fell out of your boot?
3    A.  You know, there was stuff in my boot.  It got in
4       from being out there.
5    Q.  Scallop shells?
6    A.  Yeah.
7    Q.  Anything else?
8    A.  Sand, dirt, probably some -- whatever we were in that
9       day.
10   Q.  I'm sorry, what do you mean by "whatever we were in
11      that day"?  I'm not sure.
12   A.  Well, I mean --
13   Q.  You mean the bottom, what you were dragging?
14   A.  Yeah.  Yeah.
15   Q.  So, it could be sand, it could be dirt?
16   A.  It could be little coral type -- you know, any of
17      that kind of stuff.  You know, I shook it out
18      (Smacked hands).
19   Q.  Did you check your other boot at the same time?
20   A.  No.
21   Q.  Were you surprised that that material was in your
22      boot when you shook it out?
23   A.  Sort of, yeah.  Yes.  You know, it did shock me to
24      get stabbed that hard.

Page 53

1    Q.  Aside from that, I understand that that was not
2       expected when you got jabbed in the toe, were you
3       surprised that you had bits of shell and some sand or
4       whatever was in the bottom of your boot?  Is that
5       something that happens on a scallop boat?
6    A.  Yeah.  After every watch or something, you shake --
7       after every watch, I shake out my oilers because
8       there's always stuff that gets between you in there.
9       And when I take off my stuff, I always used to turn
10      it upside down and shake it out.
11   Q.  Including your boots?
12   A.  Right.
13   Q.  And it wouldn't be unusual for you to find shells and
14      stuff in your boots?
15   A.  No.
16   Q.  After you had shaken out your boot and took off your
17      sock, did you look at your toe where you had felt the
18      jab?
19   A.  Yeah.
20   Q.  Did you see a cut?
21   A.  Not right there because I did it so quick.
22   Q.  Did you see any blood?
23   A.  Not right then.
24   Q.  Was there anything remaining on the toe, like a

PAUL WILLETT                                                                    JANUARY 6, 2006

Page 54

1      little piece of the shell that was still there?
2  A.  I didn't notice right then. I thought, you know -- I
3      looked at it. There was nothing that I could see --
4      you know, it wasn't like a three-inch thing sticking
5      in me. I presumed I cleaned myself up in a quick
6      enough way that was, you know...
7  Q.  Oh, so you could get back to your work?
8  A.  Right.
9  Q.  Did you see anything on your toe? When you looked at
       your toe, did you see anything on your toe, a cut or
       any kind of foreign object?
12  A.  At that point, no. But I believe it was in my sock,
13      something like that.
14  Q.  You described to me what you found when you shook
15      out the boot. How about the sock, did you see
16      anything on your sock?
17  A.  It was the end of the watch and, you know -- we're
18      sweaty by the end of the watch, because you've been
19      up for hours and we were getting off watch, I
20      believe, in a little while. So, I just did what I
21      did until so I could get off watch. When I got off
22      watch is when I went down and really looked at it,
23      and that's when I washed it out with peroxide and
24      stuff; and then my toe had redness in it.

Page 55

1  Q.  We'll get to that in a second. Just to finish up
2      with what you did on deck. When you shook out the
3      sock, though, you don't recall specifically anything
4      coming out of it like you described with the boot?
5  A.  Yeah, the same stuff.
6  Q.  The same stuff?
7  A.  Yeah.
8  Q.  Then you put it back on?
9  A.  Right.
10  Q.  And put the boot back on?
11  A.  Right.
12  Q.  Did you check the boot to see if there were any
13      holes?
14  A.  They were fairly new. They were only two trips old,
15      I believe.
16  Q.  So, as far as you know, there were no holes in the
17      boot?
18  A.  No, they weren't leaking. I mean, there wasn't water
19      getting in them. They weren't leaking. They were
20      pretty new, I believe.
21  Q.  After you put your sock and your boot back on, did
22      you put the elastic back on it?
23  A.  Yes.
24  Q.  Did you have any further duties before you were able

Page 56

1      to finish your watch?
2  A.  We cut until it was time to stop cutting; and then
3      you wash the scallops, bag them up, and put them
4      away.
5  Q.  How much longer do you think it was before you were
6      able to finish and then go downstairs?
7  A.  Oh, say we cut -- I don't remember the exact time,
8      but we probably cut for another hour, and then
9      20 minutes to a half-hour to bag them up and put
10      everything away.
11  Q.  Now, you said that when you went downstairs, you
12      again took off your boot and your sock?
13  A.  No, I -- when you get off deck, you take your boots
14      and oilers off in the mud room, or companionway,
15      whatever you want to call it.
16  Q.  Hang up the oilskins?
17  A.  Yeah. Hang up the oilers, put your boots, you know,
18      wherever you kept them. And then, I usually kept
19      either a pair of sneakers or slippers. I always kept
20      something that I would walk around the inside of the
21      boat with.
22  Q.  Do you recall doing all of that when you came off
23      watch?
24  A.  Right.

Page 57

1  Q.  And what happened next?
2  A.  The minute I got off watch, I went down to my bunk;
3      and that's when I checked it out and I remember
4      washing off my foot with peroxide and stuff because
5      there was redness. And I could see where, you know,
6      whatever I did -- I could see where it was then.
7  Q.  You did this in your own bunk room?
8  A.  I was sleeping downstairs at the time in the pit.
9      There was only three of us that were sharing that big
10      room with probably eight bunks in it or ten bunks.
11  Q.  Is there a water source in there?
12  A.  Downstairs, no.
13  Q.  Where did you -- how did you go about washing it off
14      as you've described?
15  A.  I went downstairs and I always, you know, kept my
16      stuff with me. And I probably -- I always had a roll
17      of paper towels with me.
18  Q.  You'd bring that with you on the trips?
19  A.  No. You take a roll of paper towels because it's dry
20      down there and, you know, you always need to put a
21      roll of paper towels above your bunk or in one of the
22      corners.
23  Q.  I got you.
24  A.  So, I had a drawer that I had, you know, all my stuff

PAUL WILLETT                                                                JANUARY 6, 2006

Page 58

1    and, you know, you bring ---
2  Q.  A first aid kit, something like that?
3  A.  Yeah.  You always had your special stuff you bring
4      with you.  I've always had, you know, antibiotics --
5      not antibiotics, you know, if you get a...
6  Q.  Like Neosporin?
7  A.  Yeah, I always had Neosporin, peroxide.  You're
8      always getting banged up, or little cuts.  Any time I
9      got a little cut, I'd either put Neosporin on or wash
10     it out with peroxide; and that's what I did to this,
11     too.
12 Q.  When you looked at your foot, when you got down
13     below, as you've just described to me, at that point
14     -- and I know you said you saw some redness on the
15     toe; is that correct?
16 A.  Right.
17 Q.  Could you see a cut?  You know, a slice in the skin?
18 A.  Like -- I mean, I could see right where it was,
19     where I had got stabbed.  It wasn't bleeding, but I
20     could see where it probably split a little.  I knew
       right where it was.
   Q.  Well, that's what I'm getting at.  I mean, could you
23     see like a pinpoint puncture, or a cut?
24 A.  More like a paper cut.  You know how you get a paper

Page 59

1      cut?  It was sort of like that, you know.
2  Q.  But you could definitely see a cut or some type of
3      break in the skin?
4  A.  Right.
5  Q.  What else could you see other than that cut or the
6      break in the skin?
7  A.  Nothing.  Just redness.
8  Q.  That's what I'm getting at.  So, around that there
9      was some redness as well?
10 A.  Yeah.
11 Q.  Anything else?
12 A.  No.
13 Q.  And was it just limited to that one toe?
14 A.  Yeah.  It was right here, like on the last -- like,
15     say this is your toe, there's your nail, and there's
16     your first knuckle (Indicating).  It was just below
17     the first knuckle.
18 Q.  So, it wasn't on the tip?
19 A.  No.
20 Q.  I get you.  It was below the nail, but before it
21     reaches the foot?
22 A.  It was right there (Indicating).
23 Q.  And just for the record, you're indicating -- using
24     your index finger, you're indicating just below the

Page 60

1      nail and above the first knuckle?
2  A.  Right.
3  Q.  Or middle knuckle, we'll call it?
4  A.  Right.
5  Q.  So, you put on some peroxide?
6          MR. ANDERSON:  Just to be clear, you're
7      talking about the first and second knuckle on your
8      toe?
9          THE WITNESS:  Yeah.
10         MR. ANDERSON:  You said between the
11     fingernail and the first knuckle.
12         MR. KIELY:  I don't know what the first or
13     the second or the third --
14         MR. ANDERSON:  It actually doesn't matter
15     if we're talking first or third because --
16         MR. KIELY:  See I thought I cleared it up
17     when I said the middle knuckle.
18         MR. ANDERSON:  The middle knuckle I
19     consider to be the first.
20         MR. KIELY:  Yes, I do, too.
21         THE WITNESS:  It was right there, but
22     pretend that was your toe (Indicating).
23         MR. KIELY:  I got you.  We understand each
24     other.  We'll fill him in later.

Page 61

1          MR. ANDERSON:  I understand it.  It seemed
2      like it was on the first piece of bone at the end of
3      the foot, but it was the second piece of bone.
4          MR. KIELY:  I'm sure the medical records
5      probably do a better job of describing it than we
6      will.
7          MR. ANDERSON:  They would use phalange.
8          THE WITNESS:  Is that what they call it on
9      the foot?
10         MR. KIELY:  Yes.
11 Q.  So, you used some peroxide?
12 A.  And then Neosporin.  I put a new pair of socks on and
13     went up to eat.
14 Q.  Did you put a Band Aid on or anything like that?
15 A.  I don't think so.  I put the Neosporin on and then a
16     brand new pair of socks.  Because after a watch, I'd
17     always go and put a brand new pair of socks on
18     because I always sweated a lot.
19 Q.  After that initial -- when you first felt that stab
20     or jab up on deck, describe for me how the toe felt.
21 A.  For the first five minutes there was  a little bit of
22     uncomfortableness; and then after that, because it
23     was, you know, after five minutes, I thought it went
24     away, but I went and checked it because we got off

Page 62

1     deck right after that.
2  Q.  So, would it be fair to say after the initial stab
3     or jab feeling, even though you continued to have
4     some pain, it got a little bit less as the day went
5     on?
6  A.  Right.
7  Q.  What happened with regard to the pain you were
8     feeling as the trip progressed?  What happened next?
9  A.  After we ate, I went to bed.  And then when I woke
10    up, there was more redness in my toe.  So, when I got
11    up, I put peroxide on it and washed it out again.
12 Q.  Was it more painful when you woke up than it had been
13    before?
14 A.  A little, yeah.  I mean, it was like, you know -- you
15    know.  And then...
16 Q.  Did it look any different?
17 A.  Not yet.  And then, I worked that next watch.  And
18    when I went back to bed the second time, when I woke
19    up, my toe like started to like, twice -- you know,
20    it started to blow up then.  That's when it started
21    to blow up.
22 Q.  So, just for accuracy's sake.  I have that the
23    initial stab incident or jabbing incident where you
24    felt that pain, that was on the 25th; is that correct

Page 63

1     as far as you know?
2  A.  I haven't looked at the dates for a long time, but I
3     believe that's the date it happened.  If I read the
4     thing --
5         MR. ANDERSON:  It might be more helpful if
6     we use the day he went to the hospital as a point of
7     reference, meaning "X" days before or something like
8     that, because I don't even know the dates either.
9         MR. KIELY:  Okay.
10        THE WITNESS:  I have a paper that I can't
11    find that I wrote everything down on.
12 Q.  Frankly, I don't know the exact date that you felt
13    the first stab is all that relevant, but I'm just
14    trying to be accurate in terms of what you know.
15 A.  Right.
16 Q.  Let me ask you this, when you felt that jab and
17    you've done everything since then that you told me
18    about, did you go at any point during that period and
19    tell Captain Nichols or anybody else about what had
20    happened?
21 A.  When I first did it, you know, I sat down on the deck
22    like I've done a hundred other times when you get
23    something in your boot or something.  And I just
24    cleaned -- you know, did what I did and I went back

Page 64

1     to work within a matter of a minute or two.
2  Q.  And you're not going to go tell the captain about
3     something like that?
4  A.  No.
5  Q.  And then, when you went down -- after your watch was
6     over, and you went downstairs and you cleaned it off
7     well, you know, for that first time down in your bunk
8     room, you didn't tell the captain then what had
9     happened, right?
10 A.  No.  I didn't tell him until the next morning when I
11    seen it get infected.
12 Q.  So, that's when you woke up again and it was much
13    worse than it had been?
14 A.  That's when I really thought -- said there's
15    something wrong.
16 Q.  What, if anything, do you recall him saying to you?
17    Did you show him, by the way, or did you just tell
18    him?
19 A.  I had gotten up early that next day.  I had gotten up
20    early and I had a satellite phone, so I had called my
21    wife and then I called my doctor, because one of my
22    friends was supposed to come out that morning.  I had
23    called my doctor for a prescription that morning.
24    And hours after that, or a couple of hours after

Page 65

1     that, that's when it really blew up.
2  Q.  I appreciate that.  I guess my initial question had
3     been when you first told Captain Nichols about it,
4     did you show him your toe, to show him what you were
5     talking about, or did you just tell him that
6     something was wrong?
7  A.  I think I just told him something was wrong at that
8     point.
9  Q.  And what did he say or do?
10 A.  Well, he -- I was pretty self-sufficient myself, you
11    know, because I've always been self-sufficient.  So,
12    there was -- I told him I think I've got an
13    infection.  I said I called my wife.
14 Q.  That's when you called?
15 A.  I called on my phone.  And then, right after that is
16    when it really just -- the whole toe just blew right
17    up and blew a big hole.  I mean...
18 Q.  Did he say anything to you, though, when you said I
19    think I have an infection?  Do you recall -- you
20    might not even remember.  I'm just asking if you
21    recall him saying or doing anything in response to
22    you telling him that you thought you had an
23    infection?
24 A.  I remember we had -- when I first told him, he told

Page 66

1     me about times that -- one time that he got infected
2     from fish poisoning or something and we were having,
3     you know, little bullshit discussions then.
4    Q. But nothing negative, he wasn't angry at you?
5    A. The first time I told him, no. I knew one of my
6     friends was supposed to come out that morning. So, I
7     was like, hey, get an antibiotic.
8          MR. ANDERSON: At some point let's stop and
9     take a break.
10         MR. KIELY: Yes, right now. That's fine.
11         (BRIEF RECESS)
12      (PREVIOUS QUESTION AND ANSWER READ BACK)
13    Q. Did you take a watch off, did you keep working, or
14     how did it go?
15    A. No. When I called my wife and I called my doctor for
16     the antibiotics, she went and picked it up and brang
17     it to Eric, or Eric picked it up at my house; and
18     then he didn't leave that morning. And then, after,
19     that afternoon, is when my foot or toe really started
20     blowing up.
21    Q. Were you working when it really started getting a
22     lot worse? I mean, were you out on deck doing your
23     job?
24    A. No. I was -- I believe when I noticed it getting

Page 67

1     worse is when I was getting up for the next watch.
2     And then I still got dressed and I told Tommy that it
3     was getting worse; and that's when he was like, well,
4     Eric's bringing you out an antibiotic and this and
5     this and that. And then, I told him that -- and
6     after that is when I told him that, you know, at the
7     end of that watch, that it was really getting bad,
8     you know, that I needed medical attention.
9    Q. Were you limping around or were you having difficulty
10     walking at that stage?
11    A. Starting to, yes.
12    Q. Did the pain increase greatly?
13    A. Yes.
14    Q. When you told Captain Nichols you needed medical
15     attention, what happened next?
16    A. That's when he was upset that I needed to go in
17     because it was going to ruin the trip and he wanted
18     me to, you know, just keep working. I told him, no,
19     I needed to go in. And then he told me, he said,
20     well, if I take you in, you're not going to ruin the
21     trip, because I told him I need antibiotics. He
22     says, we'll go in for antibiotics. And then, if you
23     don't get admitted, you'll get back on the boat. And
24     I gave him my word to get back on the boat at that

Page 68

1     point.
2    Q. So, he took you in?
3    A. When I gave him my word, that's when he took me in.
4    Q. How long did that whole conversation take place? How
5     long did that take?
6    A. We were probably up there talking to each other for
7     five to ten minutes.
8    Q. And then he turned the boat to shore and took you
9     in?
10    A. Right.
11    Q. Did they meet you somewhere, or was that later? Did
12     they go right into port or was that one of the
13     subsequent trips?
14    A. The boat couldn't go into Point Pleasant. It went up
15     to probably a half-mile to a mile before the jetty,
16     because it draws too much water to go into Point
17     Pleasant.
18    Q. At all tides, or just was it bad tide?
19    A. There's not enough water there for that boat to go
20     in. She draws like another foot or two more than
21     normal boats. She's a big boat.
22    Q. So, someone came out and met you?
23    A. The Coast Guard came out and got me.
24    Q. So, at least with regard to that, that's all the

Page 69

1     Captain could have done, right, is take you to that
2     point and have the Coast Guard meet you?
3    A. Right. And then they sat out there.
4    Q. And you were taken by the Coast Guard boat into Point
5     Pleasant?
6    A. Right.
7    Q. And you went to the hospital?
8    A. Right.
9    Q. And what happened at the hospital?
10    A. When I got to the hospital, one of the doctors that I
11     had -- she was a female. She said that I was going
12     to get admitted.
13    Q. Is this the emergency room, by the way?
14    A. Right. She said I was going to get admitted. So, I
15     called Tommy back and said, hey, I'm going to get
16     admitted. And then, like ten minutes later, they
17     said -- about five to ten minutes later, somebody
18     else came in and said that I wasn't going to get
19     admitted. So, I called him up. And when I called
20     him up, he's like -- well, that's when he told me I
21     had to come back on the boat.
22    Q. Just to back up for a second. What hospital is this
23     again?
24    A. The hospital in Cape May. It could have had a name

PAUL WILLETT                                                JANUARY 6, 2006

Page 70

1    to it.
2    Q.  I'm sure I have it in the records.
3            MR. ANDERSON:  Was it Burdette Tomlin?
4    That's in Cape May, but you're in Point Pleasant,
5    which is quite a bit farther north.
6            THE WITNESS:  Right.
7            MR. KIELY:  Is it Cape May, or no?
8            MR. ANDERSON:  It's not Cape May, because
9    that's like 60 miles --
10           THE WITNESS:  No, it wasn't Burdette
11   Tomlin.  It was a Cape May hospital.
12           MR. ANDERSON:  No, Point Pleasant.
13           THE WITNESS:  Point Pleasant hospital.
14   Q.  I mean, it wasn't like it was a long drive from
15   where you --
16   A.  From the Coast Guard station, five minutes.
17   Q.  The person that came back and told you you weren't
18   going to be admitted, was that a doctor?
19   A.  Yeah.
20   Q.  And did they tell you why?
21   A.  He said it wasn't that bad.  And then, that's when
22   Tommy told me I had to get back on the boat.
23   Q.  Did they give you anything to take with you?
24   A.  An antibiotic.

Page 71

1    Q.  And they gave you instructions on what to do with
2    that?
3    A.  Well, they said I should go home, but Tommy said I
4    had to go back on the boat.
5    Q.  But I mean, they gave you instructions on what to do
6    with the antibiotic, how often to take it, et cetera?
7    A.  Yes.
8    Q.  If you had been admitted, how would you have gotten
9    home?  How far is that from where you live?
10   A.  I would have got on the train, which is right there,
11   or I would have -- I mean, or my wife would have come
12   and got me.
13   Q.  I mean, it's not a far distance from where your wife
14   lives?
15   A.  I mean, it's probably a six- or seven-hour drive.
16   She had no problem driving.  She wanted to come down
17   and get me anyways.
18   Q.  And when you say he made you get back on?
19   A.  Well, that's what was discussed between me and him.
20   Q.  But you didn't have to -- if you didn't want to, you
21   didn't have to, correct?
22   A.  Well, I kind of -- I kind of felt like it was my job
23   if I didn't.  I was going to lose my job.
24   Q.  And you had been with them for three months?

Page 72

1    A.  Right.  So, he made it -- you know, it's like once
2    you get -- I want you back on the boat, I don't want
3    to ruin the trip.  Because they're under -- he's
4    under the gun with Danny, because there's only
5    limited access -- a limited number of days a year he
6    can fish.
7    Q.  Did he tell you specifically if you don't get back on
8    the boat, you're fired?
9    A.  In a roundabout way that's how he --
10   Q.  That's not what I'm asking you, though.  Did he say
11   to you, if you don't get back on the boat now, you're
12   fired, you'll lose your job?
13   A.  Yes, that's how I took it.
14   Q.  I'm not asking you how you took it, though, sir.
15   With all due respect, did he say to you, if you don't
16   get back on the boat, you lose your job and you're
17   fired; or is that something that, reasonably or not,
18   was implied from what he was saying?
19   A.  That's what was implied from what he was saying.
20   Q.  But he didn't use those words?  He didn't tell you if
21   you didn't get back on the boat, you were fired or
22   you would lose your job?
23   A.  Not in those words; but in his own words, that's how
24   I took it.

Page 73

1    Q.  Again, though, how you took it is different than what
2    he said.  What did he say?
3    A.  He said to me, I'm going to bring you in and you're
4    not going to -- I don't want to ruin this trip,
5    because we got a good trip going.  If you don't get
6    admitted, you're going to get back on the boat.  And
7    I said, yeah.  And when I didn't get admitted, I
8    called him up and I said I'm not getting admitted.
9    Then you'll get back on the boat like you said?  And
10   I said, yeah.
11   Q.  And that was the extent of the conversation?
12   A.  Pretty much in them words, but he made it clear that
13   he wanted me back on the boat, so he didn't mess up
14   the trip.
15   Q.  And again, I don't want to -- I'm not trying to beat
16   a dead horse.  But aside from what you told me, he
17   didn't specifically tell you, you've got to get back
18   on the boat or you're fired?
19   A.  He never used the word "fired."
20   Q.  "Lose your job," that phrase?
21   A.  He could have used that phrase, that's why I got back
22   on the boat, because I didn't want to lose my job.
23   Q.  That's what I'm getting at.  Did he say to you if you
24   don't get back on the boat --

DUNN & GOUDREAU

PAUL WILLETT                                                                    JANUARY 6, 2006

Page 74

1  A.  Yes.
2  Q.  -- you're going to lose your job?
3  A.  Yes.  That's what was said to me.  That's why I got
4      back on that boat.
5  Q.  But that's what I'm getting at.  Did he specifically
6      say to you --
7  A.  He didn't say fire.  He put my job on the line.  He
8      said, you know...
9          MR. ANDERSON:  Let me just interrupt for a
10     second.  He's asking you two sets of questions.  One
11     is why did you get back on the boat, and you told
12     him.
13         THE WITNESS:  Because I gave him my --
14         MR. ANDERSON:  Wait.  The second part of
15     the question is he's asking you about specific words
16     said in this conversation.  As to the first, you can
17     tell him what you thought and why you did things.
18     When he asks you about very specific words, did he
19     say "X," did you say "Y," did you say "X," did you
20     say "Y," tell him what the words were.
21  A.  Tommy never said the word "fired."  Tommy did say the
22     word -- you know, about my job.
23  Q.  What exactly did he say then?
24  A.  I mean, I don't remember -- I can't quote him, you

Page 75

1      know, word for word, but that is -- you know, I gave
2      him my word that I would get back on the boat if I
3      didn't get admitted.  And when I didn't get admitted,
4      he wanted me back on the boat.
5  Q.  So, you went back on the boat because you gave him
6      your word you would?
7  A.  Right.
8  Q.  And there was a time period there when you thought
9      you were going to be admitted and you told him that,
10     right?
11  A.  Right.
12  Q.  And as far as you know then, he was turning the boat
13     around and steaming back out for the trip?
14  A.  No.  He was going to go back to New Bedford.
15  Q.  Without you?
16  A.  Without me.  And that was going to break the trip up;
17     and that's what he didn't want to do.
18  Q.  And then when someone else came in and apparently the
19     decision had been changed, or there was a change in
20     the hospital's decision making and they told you
21     you weren't going to be admitted, you got on the
22     phone and called the boat to tell him you weren't,
23     correct?
24  A.  Right.  I call the boat back because he wanted to

Page 76

1      know what was going on.  He had me keep in touch with
2      him.
3  Q.  But at the point when they came back in and changed
4      their mind, he thought you were admitted and he was
5      on his way back to New Bedford?
6  A.  Yeah, he was going to go to New Bedford.
7  Q.  And at least as far as you knew, your job wasn't in
8      jeopardy at that point, right, because you had been
9      admitted?
10  A.  Within those couple of minutes, no, I thought I was
11     going to be admitted.  And then, the minute they
12     came back and told me I wasn't getting admitted,
13     that's when I called him back and he said, "Well, are
14     you going to get back on the boat?" and I said,
15     "Yeah."
16  Q.  What happened next, you went back on the boat?
17  A.  Uh-huh.  Yes.
18  Q.  Did you finish the trip?
19  A.  No.  It was either two or three days -- the swelling
20     went down.  And then all of a sudden one day, it
21     could have been two or three days, I have it written
22     down somewheres --
23  Q.  Were you taking antibiotics?
24  A.  Right.  It looked like it was going to be fine; and

Page 77

1      then, after probably three days, all of a sudden my
2      foot blew up again.  And that's when I told him I had
3      to go in; and then, when I told him he had to go in,
4      he was like can you last one more watch, can you last
5      one more watch.
6  Q.  And did you?
7  A.  I tried and then the pain was too much.  I couldn't
8      do it.
9  Q.  And what happened then?
10  A.  Then he brang me in -- then we went into New Bedford.
11  Q.  You went all the way back home?
12  A.  Right.
13  Q.  Is that what you wanted to do as opposed to going
14     back to, say, Point Pleasant or somewhere else?
15  A.  At that point I just wanted medical attention.
16  Q.  You didn't really care, which he did.
17  A.  Well, I mean, you don't have many options when you're
18     out there.  I believe we were further to the east
19     than we were the first time, so that would have put
20     us offshore a little more.
21  Q.  So, at least as far as you were concerned, it made
22     sense to go into New Bedford?
23  A.  From that point, yeah.
24  Q.  What happened when you got there, to New Bedford?

Page 78

1   A.  I had somebody pick me up and I went and got admitted
2       to the hospital.
3   Q.  In this last portion of what you're telling me, when
4       your foot blew up again, or your toe blew up again
5       and you had to go back in, did Captain Nichols at
        that point threaten your job at all?
    A.  No, because the infection was, you know -- the
8       infection was, you know, what it was.
9   Q.  Did he see it?  Did you take off your sock and show
10      it to him?
11  A.  I believe I did.  Yeah, he did see it both times.
12  Q.  Both times?
13  A.  Right.
14  Q.  Did he see it -- when you had to go in the first
15      time, when the Coast Guard met you out from Point
16      Pleasant, had you shown it to him at that point?
17  A.  Yes.  I showed it to him, because he wanted to see
18      what happened.  And I believe I had a fever coming
19      on, too.
20  Q.  What happened when you got back into New Bedford?
21  A.  I had somebody pick me up and I got admitted to the
22      hospital.
23  Q.  Was that St. Luke's?
24  A.  No.  St. Luke's wouldn't admit me.

Page 79

1   Q.  Did you go there first?
2   A.  Right.
3   Q.  And then you went to the emergency room?
4   A.  Right.
5   Q.  What did they tell you?  What do you recall about
6       that trip to the emergency room?
7   A.  When I got to the emergency room, they did some
8       paperwork and I answered some questions.  And then,
9       they said my doctor didn't have admitting rights
10      there.  And since the other hospital was so close,
11      that I would have to go to Saint Anne's, and that's
12      how I ended up at Saint Anne's.
13  Q.  And your doctor did have admitting rights there?
14  A.  Right.  He didn't have admitting rights at St.
15      Luke's, but he did have them at Saint Anne's and
16      Charlton.
17  Q.  You were admitted right away?
18  A.  At Saint Anne's, yes.  Within two or three hours
19      after I got off the boat, between St. Luke's and all
20      that.
21  Q.  What was the appearance of your toe when you were
22      admitted to Saint Anne's?
23  A.  My foot was blown up, black and blue, purple.
24  Q.  Swelled?

Page 80

1   A.  Yeah.
2   Q.  When you say "your foot," had it gone between the
3       toe?
4   A.  Yeah.
5   Q.  Where was it?
6   A.  Probably the whole -- I mean...
7   Q.  The instep?
8   A.  Yeah.  The whole top of my foot, the whole thing was
9       swollen.
10  Q.  What about your other toes, any problems with the
11      other toes at that point?
12  A.  No.  If I remember right, the toes pretty much stayed
13      small.  It was like from -- you know, the toes pretty
14      much stayed small at that point.
15  Q.  So, the infection kind of went from that second toe
16      up into the foot?
17  A.  Right.  And then, it started traveling -- then, it
18      started going up into, you know -- beyond the heel
19      and beyond the ankle.  It started getting...
20  Q.  Was that while you were in the hospital?
21  A.  That was on the ride up.
22  Q.  What do you recall about what treatment you received
23      while you were in the hospital on that occasion?
24  A.  Oh, they put I.V.s into me and they just pumped me

Page 81

1       full of antibiotics.
2   Q.  Do you recall conversations with the doctors as to
3       what was going on?
4   A.  Yeah.  I remember talking to my doctors.
5   Q.  What did they tell you?
6   A.  That it was a nasty infection.  I don't remember the
7       exact words, but it was a bad infection.
8   Q.  They were using the word "infection"?
9   A.  Yeah.  They had their own terms for it.
10  Q.  What treatment did you get while you were there?
11  A.  I was -- you know, they put me in a bed and they
12      hooked me up to I.V.s.  I think they made me use a
13      walker or a cane -- walker, I believe, when I went to
14      the men's room or did anything, or a wheelchair.
15  Q.  How long were you in?
16  A.  I want to say three, maybe four days.
17  Q.  And then they discharged you?
18  A.  Yes.
19  Q.  What did they tell you on discharge?
20  A.  I had received another doctor's appointment, and that
21      was a couple of days later.  When I went to my
22      doctor's appointment, my doctor said -- my doctor
23      looked at my foot and looked at it all over and, you
24      know, he said everything was all set.

L WILLETT                                                                    JANUARY 6, 2006

Page 82

Q. Had the appearance and the infection, at least as far as you could tell, had that gotten better over that time period?

A. It looked like a normal foot when I went for my next doctor's appointment.

Q. Was there still a cut or a visible laceration on your toe?

A. I believe not.

Q. So, you couldn't see anything on the toe?

A. Right. He found everything fine at that second doctor's visit.

Q. Did you ever tell any of those doctors at that visit, or when you were in the hospital as an inpatient, that at some point you had seen a cut on your toe?

A. Yeah, I told them where the stab was. And like I said, it was like a paper thing. I mean, I showed them, you know, exactly where it was. And when it swelled up -- when it swelled up, it messed up the whole front of it, like it blew out pus, but the cut was up here (Indicating).

Q. The tip, you mean?

A. Yeah.

Q. But that was a different spot from where the cut had been?

Page 83

A. Well, the pressure was so great that it finally just went somewheres.

Q. No, I understand. But what I'm getting at is that top part that ruptured and had pus coming out of it, that was in a different location than where that paper cut-type thing you had seen was?

A. Right.

Q. What happened next with regard to your condition after that appointment that you had?

A. Then a few days later I went back fishing.

Q. Did you go back on the LIBERTY?

A. Yes.

Q. And as far as you knew, you still had your job and everything was okay with Captain Nichols?

A. Uh-huh. Yes.

Q. And what happened next?

A. We fished -- I believe it was a closed-area trip and I believe it was a six or a -- I mean, a seven to a ten-day trip and I was fine. I was fine until the last 24 hours or 30 hours of the trip. And then, all of a sudden my foot got -- started feeling funny and all of a sudden it blew up the same way again.

Q. Had you been on antibiotics for that trip?

A. In the beginning I believe I -- I can't remember

Page 84

whether I was still on them or not. I could have still been on something. I don't remember.

Q. You're not sure one way or the other?

A. It probably says it in my medical records. I could have been taking a pill for that, but I don't remember.

Q. So, when it blew up again, would you describe it as being similar as to when you had gone into the hospital?

A. Yeah.

Q. What happened -- you were working at the time when it happened, right?

A. Right.

Q. Were you on a watch?

A. I noticed it when I got off watch, that all of a sudden it started feeling funny.

Q. Did you feel that stabbing again?

A. No.

Q. Did the boat have to go in?

A. No. It was at the completion of the trip.

Q. All right. So, you didn't have to interrupt that trip?

A. No.

Q. What happened when you got back in?

Page 85

A. I went to the hospital.

Q. Which hospital, the same one?

A. Yes. Saint Anne's again.

Q. What happened when you got to Saint Anne's?

A. The same thing, back in the room, back on I.V.s, back on -- Dr. Piva at that point was -- you know, he was like he just couldn't believe I was back.

Q. And did they give you any kind of different treatment this time than the last time?

A. I think that's when the treatment started. That's when, I believe, I seen Dr. Appleton, too, and Dr. -- there was one other doctor. I can't remember his name.

Q. Someone different than you had seen before?

A. Right. Mayo or something like that.

Q. Were these guys specialists as far as you know?

A. One was a surgeon and one was an infectious disease doctor.

Q. Is this when they talked to you about just removing the toe?

A. No.

Q. What happened -- you tell me, what happened during the rest of that hospitalization.

A. I stayed in the hospital for four or five days, and

PAUL WILLETT                                                    JANUARY 6, 2006

Page 86

1    then I took a trip off, and then I had made a couple
2    of office visits and Dr. Piva had said everything
3    looked good.
4    Q.  Are we into December now, you think, based on your
5        memory?
6    A.  Yes, that's when I took the second trip off; that's
7        when I took the trip off through December.
8    Q.  What was the next problem that you encountered?
9    A.  I got a release from Dr. Piva, again, and then I was
10       home through the beginning of January.  We went out
11       fishing on the 3rd -- the 2nd, 3rd, or 4th of
12       January.
13   Q.  '04?
14   A.  Yeah.
15   Q.  And what happened then?
16   A.  I finished the trip up until the last day or two,
17       and then my foot started getting swollen again.
18   Q.  Was this one of the shorter trips?
19   A.  I think that was the longest one of the bunch.  It
20       was the last one I fished in January.
21   Q.  But you substantially made it through that trip until
22       the very end?
23   A.  Until the very end.  And then all of a sudden at the
24       end, it just (Snapped fingers).

Page 87

1    Q.  The same thing?
2    A.  The same thing.  It blew up again.
3    Q.  The same rupturing at the tip of the toe?
4    A.  Yup.
5    Q.  Did the boat -- to your knowledge, did the boat go in
6        prematurally, or did it just run the course of the
7        trip?
8    A.  Within the last couple of -- within 12 hours or
9        something, that's when it started blowing up; and
10       that's when all of a sudden, it just did the same
11       thing like it did the trip before.
12   Q.  So, you were heading in anyway at that point?
13   A.  Right.
14   Q.  And did you go back to Saint Anne's?
15   A.  Yeah.
16   Q.  Did they admit you again?
17   A.  No.  I went -- we got in and we went to -- I didn't
18       go right to Saint Anne's Hospital.  I went right to
19       Dr. Piva's office and Dr. Piva sent me over to the
20       surgeon's office, rather than the hospital.  And
21       then, they just put me on an antibiotic and scheduled
22       -- that's when I went -- I went to Dr. Piva's office,
23       he sent me to the surgeon.  I can't remember his
24       name, Kenneth Mayo, or something like that, he's a

Page 88

1    surgeon; and that's when he put me on an antibiotic
2    and he sent me home.  He told me he was going to cut
3    my toe off, but he didn't admit me.  He said, "You
4    know, I'm going to cut your toe off."  And then, I
5    thought I was going to get it cut off in a day or
6    two, but I think he went to the Super Bowl that
7    weekend.  I had to wait the weekend and I was pissed,
8    I remember, and then he came back and cut my toe off
9    on Monday or Tuesday.
10   Q.  When he told you he was going to do that, what was
11       your reaction?
12   A.  I was mad that I was going to lose a body part.
13   Q.  Did you consider getting a second opinion, or did you
14       get a second opinion?
15        THE WITNESS:  To get my toe cut off the
16        first time?
17        MR. KIELY:  Yes.
18   A.  It's just so hard getting to see these people.  I
19       called and, you know, I got an appointment on the
20       23rd or I got an appointment -- so, at that point I
21       let him cut my toe off, you know.
22   Q.  So, would it be fair to say you tried to get a
23       second opinion?
24   A.  I did call, yeah.

Page 89

1    Q.  But you couldn't get an appointment?
2    A.  Right.
3    Q.  So, you acquiesced to the doc --
4    A.  Yeah, and I got my toe cut off.  And when I got my
5        toe cut off, it was 14 days later he told me I was
6        still infected.  He cut my toe off, because he said
7        it was in the bone.  So, he cut my toe off and he
8        said he got everything.  So, I was naturally pissed
9        about that.  And then 14 days later, he -- the doctor
10       in Fall River told me I was now infected in this bone
11       and in this bone (Indicating).
12   Q.  They caught that on some follow-up appointment you
13       had after the surgery?
14   A.  Fourteen days after surgery is when I went into
15       Charlton Memorial the first time.  And then, he came
16       in and seen me, had me X-rayed, and told me I had
17       bone disease here and bone disease there
18       (Indicating).
19   Q.  Now, you're saying there and just so it comes out on
20       the record --
21   A.  Go ahead, you tell her.  They call it metacarpals, I
22       believe.
23   Q.  Well, you're indicating basically onto the instep of
24       your foot?

PAUL WILLETT                                                                JANUARY 6, 2006

Page 90

1    A.  They cut the metacarpal from, say, the -- call that
2        the second toe.
3    Q.  The bone on the top of your foot?
4    A.  Right, and the bone in my third toe.
5    Q.  And to your understanding, that was done because the
6        infection had spread from that second toe?
7    A.  Yes.
8    Q.  Were any of the other toes at that point infected or
9        affected by what was going on with your foot?
10   A.  No.  But at that point when he had said that, that
11       there was more bone disease in there, and then he
12       says -- then, right after that I was unhappy with
13       him, because, you know, he said he had it all, and I
14       thought it was over with, but then he told me I had
15       more; and that's when a friend of mine stepped in and
16       got me into Lahey Clinic.
17   Q.  Which Lahey Clinic, up here in Burlington?
18   A.  Yeah.
19   Q.  And what happened then?
20   A.  I got this infectious disease doctor named -- it was
21       Dr. Duncan and a surgeon called Dr. Tabargen
22       (Phonetic).  And those guys did whatever they did and
23       they did it right.
24   Q.  Was there any further surgery?

Page 91

1    A.  Not after I got through with Dr. Duncan and
2        Dr. Tabargen.
3    Q.  Did they put you on a different --
4            MR. ANDERSON:  I don't think you
5        understood.  I think that Tabargen did do surgery,
6        not after that.
7    Q.  He did the removal of the additional bone?
8    A.  Right.
9    Q.  I understand that.  I mean, was there anything after
10       that that they did?
11   A.  No, but he told me in a couple of years I'm going to
12       need more surgery, because I can feel it now, the
13       heel of my foot's moved over.
14   Q.  The bottom of your foot?
15   A.  Right.  My heel's moved over.  So, he said in a
16       couple of years -- I can start feeling now what he
17       was saying.  I'm going to need more surgery on my
18       foot (Indicating).
19   Q.  You're saying the heel, but it looks like you're
20       indicating the ball of your foot?
21   A.  The ball of my foot.  The ball of my foot is moving.
22   Q.  Is that because of the change in the position of the
23       bones in your foot?
24   A.  Right.

Page 92

1    Q.  Has he told you that that's for sure something you're
2        going to need, or something you might need?
3    A.  He said most likely it's something I'm going to need,
4        but as of right now, I can feel it getting worse.  I
5        can feel it coming, because I can't walk around
6        barefooted at all anymore.  I mean, it's like the
7        ball's moved way over.  So, if I walk barefoot, it's
8        like a ball-peen hammer now.  And so, I'm probably
9        going to need more surgery on it.
10   Q.  That's not something that's scheduled at the moment?
11   A.  No.  I'm going to live with it like it is until it
12       gets uncomfortable enough to where I can't.
13   Q.  Just to back up a second.  That second surgery where
14       they did the bone resection on the top of your
15       foot, that --
16   A.  Right.
17   Q.  -- was done at Lahey, when was that?
18       Are we talking January, February '04?
19   A.  February.  Sometime in late February.
20   Q.  And were you an inpatient for that surgery?
21   A.  No.  I was up at Lahey Clinic for probably a week.
22   Q.  As an inpatient?
23   A.  Yeah.
24   Q.  And after you checked out, or were released from the

Page 93

1        Lahey Clinic after that surgery, did you have any
2        further surgery on your foot?
3    A.  No further surgery, but I kept -- I was on -- I've
4        been on all kinds of -- Dr. Duncan had me on
5        medicines still for a while.
6    Q.  And you'd follow up periodically with the docs?
7    A.  Right.  Up until, I think it was, the end of July, or
8        something like that, or the beginning of July when I
9        finally got my release from him.
10   Q.  July of '04?
11   A.  Right.
12   Q.  The last trip that you had worked before you went in
13       for the surgery, that was January of '04?
14   A.  From the 3rd or 4th to the 17th or the 16th.
15   Q.  And then, you didn't work again -- well, let me ask
16       you this.  When was the next time you went back to
17       work after that surgery?
18   A.  May.
19   Q.  May of '05?
20   A.  Yeah.
21   Q.  And, I mean, when I'm saying work, I mean any type of
22       work, any type of gainful employment where someone's
23       paying you to do a job?
24   A.  Well, I drove a limousine when I was in school, but

Page 94

1    that was just, you know...
2  Q.  We'll get to that, that's fair enough.  I'm just
3    looking to make sure -- I'm not talking about
4    fishing.
5  A.  I'm not calling that real work.
6  Q.  I got you.  But you got paid for it?
7  A.  Right.
8  Q.  What I'm getting at is -- I just want to make sure
9    I'm clear.  I know you didn't go back to fishing?
10  A.  Right.
11  Q.  I want to make sure -- is there anything else you're
12    doing for pay.  Now, you mentioned limousine work and
13    I'll get to that in a second.  Was there anything
14    else other than limousine work?
15  A.  I started driving a limousine probably late August,
16    early September.
17  Q.  Of '04?
18  A.  Yeah.
19  Q.  Not this past August and September?
20  A.  No.
21  Q.  Anything else other than the limousine work that you
22    got paid for?
23  A.  No, that's all I could do at first.  Because when I
24    was done with my injury, I was up to almost 300

Page 95

1    pounds from not --
2  Q.  Inactivity?
3  A.  Inactivity.  And I couldn't -- by the time I was
4    done, I couldn't even walk up and down the stairs
5    without being winded.  It took me quite a few months
6    to get that weight off.
7  Q.  When did they put you on the insulin, that was after
8    the surgery, right?
9  A.  They put me on the insulin at Charlton Memorial
10    Hospital when they couldn't control my sugar anymore.
11  Q.  Was that before or after the toe came off?
12  A.  I think just after the toe came off, just in
13    that...
14  Q.  In that range?
15  A.  In that range.
16  Q.  And you've been on insulin since then?
17  A.  Right.  And now I've taken off a lot of weight and
18    changed my diet.  You know, I got my diet right and
19    now I'm ready to come off it again.
20  Q.  So, based on what you told me prior, previously
21    during the deposition, it sounds like you've lost
22    about what, 40 pounds since then?
23  A.  Yeah, and I'm still trying to lose weight.
24  Q.  Let's talk about the period after you had the Lahey

Page 96

1    surgery.  You were discharged to home; is that
2    accurate?
3  A.  Yes.  And then I had nurses come in and I had a
4    therapist come in once.
5  Q.  A physical therapist?
6  A.  Yeah.
7  Q.  When you were at home -- and let's start, you know,
8    chronologically, right from when you got home after
9    that Lahey surgery.  What could you do?
10  A.  Nothing.  They had me on a vacuum.  When I got home,
11    I had some vacuum that -- because there was a big
12    slice in my foot.  They had me on some vacuum.  They
13    put a piece of plastic with holes in it and it was a
14    vacuum that was supposed to seal the cut up, but the
15    way the cut went, they had a hard time with it
16    because it was between my big toe and this toe
17    (Indicating).  It was a vacuum --
18  Q.  So, it was some sort of device that was attached to
19    your foot?
20  A.  Right.  I was attached to that for a while.
21  Q.  And you couldn't walk?
22  A.  No.  I could unplug it to go to the bathroom.
23  Q.  For that kind of thing you could get up?
24  A.  I could get up and get on my walker.  It was more

Page 97

1    comfortable to roll over off the bed and go on my
2    hands and knees.
3  Q.  So, if you weren't getting up to go to the bathroom
4    or shower or whatever, to wash yourself, you were
5    lying on the couch or lying in bed?
6  A.  Lying in bed.  My wife had everything set up so I
7    just stayed in the bedroom.
8  Q.  How long did that last?  Being in that condition,
9    that limited, how long was that?
10  A.  Six weeks probably.
11  Q.  What was the next step, sort of the next transition
12    step from that?
13  A.  You know, I went from that -- I went from the vacuum,
14    then I went to a walker, then I went to the crutches,
15    and then I think I might have even used a cane for a
16    couple of weeks.
17  Q.  Was the walker the first thing you went to?
18  A.  Right.
19  Q.  What were you doing when you were able to get up and
20    use the walker?  Could you then leave your home, or
21    were you still basically stuck in the house?
22  A.  I was pretty much stuck in the house.  Once in a
23    while, I'd come down and make her take me for a ride,
24    you know, because I --

PAUL WILLETT                                                    JANUARY 6, 2006

Page 98

1  Q.  You still couldn't drive?
2  A.  No, not right away.  It took me a couple weeks before
3      I was able to drive.
4  Q.  During that six-week period that you talked to me
5      about, you didn't drive then, right?
6  A.  I could have, but if I did go anywheres, it was
7      limited.  I really didn't go anywheres with the
8      vacuum on.  I don't believe I went out much with that
9      vacuum on.
10 Q.  What was the next step after that second step, you
11     were on crutches then?
12 A.  Crutches.  I didn't go on crutches until they got rid
13     of the vacuum.  The vacuum didn't work, for one.
14     They couldn't get it right or they had some problem
15     with whatever that machine was.
16 Q.  And during that whole time period you were
17     periodically going in for checkups with your doc?
18 A.  Right.
19 Q.  At what point did you start beginning to function in
20     a more normal fashion?
21 A.  When I got to the crutches.
22 Q.  Do you know what like time of year we're talking
23     now?
24 A.  I guess I started getting around four to six -- I

Page 99

1      started getting around more by myself four to six
2      weeks after I got out of the hospital.
3  Q.  So, are we talking April or May of '04?
4  A.  Yeah.
5  Q.  And then what happened next, once you were able to
6      start to get around more normally?
7  A.  Then -- I really didn't do much for the first couple
8      of months because I was, you know -- and when my foot
9      was finally good enough to start -- get off the
10     crutches and stuff, that's when I finally, you know,
11     started taking the dogs for a walk and doing that,
12     because I really couldn't go too far for a while.
13 Q.  When you were able to start taking the dogs for a
14     walk, get yourself out for a walk, are we talking in
15     like April, May?
16 A.  Yeah.
17 Q.  And obviously, up to that point, there wasn't any
18     thought of going back to work?
19 A.  No.
20 Q.  Is that the point when you started to think about
21     trying to get back into getting to work, earning a
22     living?
23 A.  Probably the end of May I started feeling, you know,
24     I had to start getting my body back into -- I had to

Page 100

1      start getting the weight off and start doing
2      something.
3  Q.  So, what did you do?
4  A.  Basically, all I could start doing was, you know,
5      walking a little bit at a time.  I had an exercise
6      bicycle in the room that I tried once in a while.  I
7      tried to get on that and, you know, the more time
8      that went on, the easier it was to ride the bike and
9      the easier it was to walk.
10 Q.  At some point did you feel like you pretty much got
11     back to where you were walking normally other than
12     that problem you've told me about with the ball of
13     your foot?
14 A.  It gets worse now over time, but...
15 Q.  When did you feel like you got back to pretty much,
16     if not completely, normal functioning, to where you
17     were almost back to normal?
18 A.  I'd say the first of last year.
19 Q.  Okay.  The beginning of '05?
20 A.  So, I probably got released from the doctors in June.
21 Q.  Of '04?
22 A.  Of '04.  And then, it wasn't until after the first of
23     the year that I started feeling comfortable with
24     myself, because I was so heavy.  And then, I didn't

Page 101

1      fit into nothing, and I couldn't walk, and it was
2      tough to get around.
3  Q.  Was it after the first of the year; in other words,
4      sometime in January of '05 that you tried to go back
5      to fishing?
6  A.  I tried to go fishing one time.
7  Q.  In that time range?
8  A.  No.  I didn't try to go fishing until just before I
9      -- I was in school.  I was just finishing school up.
10 Q.  Let me ask you this, I guess what I'm getting at is
11     at some point you tried to go back fishing?
12 A.  I tried a four-day trip or a five-day trip.
13 Q.  Who took you?
14 A.  I went on a boat called the AGGRESSOR, I believe.
15 Q.  Do you know who the owner is, or the captain?
16 A.  It was a kid named Brett.  I didn't do good and I
17     couldn't keep up.  I already had my -- I already was
18     finishing up my licenses.
19 Q.  Was it scalloping, by the way?
20 A.  Yes.
21 Q.  Do you recall what time of year it was when you went
22     on the AGGRESSOR?
23 A.  Spring.  Late winter, early spring.
24 Q.  Of '05?

WILLETT                                                                    JANUARY 6, 2006

---

102

A.  Yeah.

Q.  And that was the first time you tried to go back
    fishing?

A.  That was the first and last time.

Q.  So, you didn't -- it didn't reach a point at some
    point where you called Dan Arletson or Captain
    Nichols and said I'd like to come back?

A.  Yeah, I did go in July.  In July I went to talk to
    Danny.

Q.  July of '04?

A.  Yeah.  I told him I want to go back to work.

Q.  Did you feel like you were ready to go back to work
    at that point?

A.  I figured it was -- you know, I was going to have to
    try it sooner or later.

Q.  And what happened?

A.  He wouldn't let me go back to work.

Q.  What did he say, as best you can recall?

A.  He said he didn't want to take a chance with me to go
    back to work for him because of my infections.

Q.  And this is Dan Arletson?

A.  Yes.

Q.  What did you do next?  Did you try to go on a
    different boat?

---

Page 104

1   fishing, they've gone and worked on tugboats.  And
2   everybody that is a little older than me said, you
3   know, that's the way to go if you're going to go and
4   do something.
5   Q.  What is the difference in terms of what the work is?
6   A.  It's not nearly as physical.  I mean, you do
7       something physical, but it's only like for five or
8       ten minutes at a time, you know, once every three
9       days compared to scalloping, which is like 18 to 20
10      hours a day, you know, straight out.
11  Q.  So, that was your idea then, you were going to
12      take these courses and then see if you could get on a
13      tug?
14  A.  Right.
15  Q.  Did you complete the courses?
16  A.  Yes.
17  Q.  Did you get the licenses we discussed?
18  A.  Yup.
19  Q.  Which ones specifically did you get, the able-bodied
20      seaman?
21  A.  Yes.  My STCW, my tanker man's papers to work on a
22      barge and a 100-ton captain's license.
23  Q.  When did you finish that up, that program?
24  A.  I finished that up in -- I finished up probably at

---

Page 103

1   A.  No.  That's when I looked at my options and there was
2       a program in New Bedford to go back to school.
3   Q.  Tell me about that program.  I know we talked about
4       it a little bit, but I didn't get the details.  What
5       was it?
6   A.  It's a program that helps you go back to school for
7       fishermen.  New Bedford Fishermen's Welfare Fund or
8       something like that it's called and they paid for me
9       to go back to school and get some courses.
10  Q.  What's it aimed at?  What are they trying to get you
11      to?
12  A.  Trying to get you back to work.
13  Q.  Is it like a physical rehabilitation thing, or?
14  A.  No.  You go in and they have probably anywheres from
15      15 to 30 occupations that they'll try you for, you
16      know, like air conditioning, those kind of things.
17  Q.  And what were you taking courses in?
18  A.  I took a course to get my captain's license, my
19      able-bodied seaman's license, my tanker man's papers
20      and, you know, my STCW papers.
21  Q.  What was the idea behind getting those?  What did you
22      want to do with it?  I mean, obviously, you weren't
23      going to go back fishing.
24  A.  Right.  A lot of my friends, when they've gotten done

---

Page 105

1   the end of February.  I had a hard time getting one
2   of the papers that I needed because I had never been
3   on a 200-ton vessel.  It's some kind of Coast Guard
4   regulation that took me an extra month or two to
5   get.
6   Q.  We're talking February of '05?
7   A.  Right, and then I started in May.  I finished my
8       courses in February or March, I believe, and then I
9       finally went to work in May.  I had some Coast Guard
10      thing that I had to -- they make you do all kinds of
11      crazy things.
12  Q.  What did you go to work doing?
13  A.  I went to work for Penn Maritime in New York.
14  Q.  Is that where you work now?
15  A.  Yes.
16  Q.  Could you just spell that for me?
17  A.  P-E-N-N.
18  Q.  So, you went to work for Penn Maritime in June?
19  A.  May or June.
20  Q.  May or June of '05?
21  A.  Uh-huh.
22  Q.  Yes?
23  A.  Yes.
24  Q.  What do you do for them?

---

PAUL WILLETT                                                                JANUARY 6, 2006

Page 106

1   A.  Right now I'm an able-bodied seaman and I just
2       finished my -- I'm just waiting to go to the Coast
3       Guard to get an endorsement to work on the barges.
4       I'm just waiting for the paperwork.  Because once you
5       get your license, you've got to put the time in to
6       get your endorsement.
7   Q.  So, when you started with them, you just started as
8       an able-bodied seaman?
9   A.  Right.  And by next year, or in another couple
10      months, I'll move up another step, you know.
11  Q.  What's the next step?
12  A.  The next step, I want to work on the barges.
13  Q.  In the pilothouse?
14  A.  No, loading and unloading the barges.  You know, we
15      push asphalt around.
16  Q.  With regard to what you started out doing as an
17      able-bodied seaman, what kind of vessels are you
18      on?
19  A.  Just, I believe, it's a 125 -- 25, 20-foot tug.
20  Q.  Where do you work out of?
21  A.  The company's -- the boats are based out of
22      Staten Island, New York, but you get on them
23      anyplace.  Wherever the boat is, that's where you get
24      on and off.

Page 107

1   Q.  What kind of money are you making?
2   A.  225 a day.
3   Q.  225 a day?
4   A.  Yeah.
5   Q.  Is it a day rate, is that how you get paid?
6   A.  Yeah.  And then you can -- if they wake you up on
7       your off watch, you can make some overtime, but
8       that's basically what it is.
9   Q.  And then how does it work, do you work like a normal
10      workweek?
11  A.  21 days on, 21 days off.
12  Q.  Have you figured out -- what does that work out to
13      for a yearly salary?
14  A.  Base pay with no overtime or not working over, it's
15      about 42,000.
16  Q.  Well, you haven't put in a full year yet then, right,
17      so it would have been --
18  A.  I've worked six months -- I worked what's called
19      June, the end of May.  So, I worked six months and I
20      probably made 31 or 32,000 in six months, but I stood
21      over a lot.
22  Q.  So, the potential is there to make a little more than
23      42, but the number would be 42 if you just worked
24      your regular hours?

Page 108

1   A.  Right.  Well, I had been out of work for so long I
2       worked over a couple of times.
3           MR. ANDERSON:  Working over, meaning
4       working 21 days and then working another 21 days.
5   A.  No, working another seven or ten.
6   Q.  If you know, what would be the difference in pay if
7       you make that move up that you're talking about once
8       your licensing's all squared away?
9   A.  Base pay would probably go up to 55 instead of 40, if
10      I get this next license.
11  Q.  So, that's a significant jump then from what you're
12      making now?
13  A.  I believe that's what -- just do the math.  290 times
14      185.
15  Q.  So, you'd go from 225 a day to 290 a day?
16  A.  Yes.  I believe that's what it is and if they have an
17      opening.
18  Q.  How has it been going with Penn Maritime?  Is it
19      going well?
20  A.  I think I'm liked there.
21  Q.  And you like it?
22  A.  Yeah.
23  Q.  Do you feel physically able to do the job that you're
24      doing?

Page 109

1   A.  Yeah.
2   Q.  They hired you without any -- well, they knew about
3       your condition, correct?  Or, do they?
4   A.  What do you mean know about my condition?
5   Q.  Your foot.  They knew that you lost a toe.
6   A.  Yes.  I put down that I had a...
7   Q.  A toe amputation?
8   A.  Yes, I wrote that down.
9   Q.  I mean, obviously, that didn't have any effect on
10      your ability to get the job?
11  A.  No.  I think they asked did you have surgery and I
12      think I put it down.
13  Q.  Let me go back to your time on the LIBERTY, and
14      specifically, that trip in October where you first
15      came up with your injury.  In your estimation, what
16      was it that caused you to get injured?
17          THE WITNESS:  What was it that caused me?
18          MR. KIELY:  Yes.
19  A.  The stabbing.
20  Q.  So, at least as far as you understand, it was
21      something in your boot that cut your toe?
22  A.  Right.
23  Q.  In your estimation, to your understanding, was there
24      something that the boat did or that Captain Nichols

PAUL WILLETT                                                                 JANUARY 6, 2006

Page 110

1     did wrong that led to that occurring?
2         MR. ANDERSON: The actual stabbing?
3         MR. KIELY: Yes.
4  A.  It was -- there was the dirty working conditions. I
5     mean, we were working a lot of hours and we were
6     working hard and, you know, that's what I contribute
7     it to.
8  Q.  But I think I asked you before, was there anything
9     about what you were doing on that trip any different
10    than what you do as a scallop deck hand in general?
11  A.  No.
12  Q.  Let me show you what we've premarked --
13        MR. KIELY: I think I gave you a copy of
14    this already, David. It's the statement that he gave
15    to Frank Sweeney.
16        MR. ANDERSON: I don't believe he's ever
17    seen that before, nor do we have the tape.
18        MR. KIELY: I don't have the tape either,
19    but I'm assuming it's out there somewhere.
20  Q.  Do you want to take a minute and read through it, or
21    have you seen that before?
22  A.  (Witness perusing document) Well, it says '85, '86.
23    I probably said -- yeah.
24  Q.  For a second, let's just let you read it and you

Page 111

1     don't have to say anything. Just go ahead and read
2     through it and I'll ask you some questions at the
3     end, and I'll let you say whatever it is you want to
4     about it. Okay?
5  A.  (Witness perusing document) I see the dates are off.
6  Q.  Hang on a second. I appreciate what you're doing,
7    but why don't you go through the whole statement, to
8    yourself, and then at the end I'll ask you some
9    questions and we can clarify some things. All right?
10  A.  Okay (Witness perusing document).
11  Q.  You were going to tell me something about dates that
12    were wrong.
13  A.  I don't remember -- you said the time or whatever,
14    the 16th.
15  Q.  You're on page 2 of your statement?
16  A.  Didn't you ask some --
17        MR. ANDERSON: I'm going to object to you
18    calling it a statement, because I've never seen a
19    statement, which was actually transcribed. And I
20    don't think you've heard the tape and you don't take
21    the statement, so you don't know whether this is
22    accurate. He doesn't and I don't.
23  Q.  Let me ask you a couple questions first. Do you
24    know Frank Sweeney? Do you know who Frank Sweeney

Page 112

1     is?
2  A.  Yeah, in New Bedford.
3  Q.  Yes. At Marine Safety Consultants?
4  A.  Right.
5  Q.  Do you recall meeting with him at some point?
6  A.  Right.
7  Q.  And giving a statement while he recorded it?
8  A.  Yes, I remember that. That's this (Indicating).
9  Q.  And he had a tape on?
10  A.  Right.
11  Q.  And he asked your permission to tape it?
12  A.  Right.
13  Q.  Have you ever seen a transcript of that tape in a
14    form like this?
15  A.  No. This is the first time.
16  Q.  You've had a chance to read your transcribed
17    statement there?
18        MR. ANDERSON: I'm going to object. You're
19    saying it is a transcribed statement. I'm not
20    suggesting that there is anything wrong or there
21    isn't. Any way he answers the question, it assumes
22    that this is an accurate transcription of his
23    statement.
24        MR. KIELY: I'm not assuming anything.

Page 113

1        MR. ANDERSON: Well, when you say have you
2    seen the transcript of your statement?
3        MR. KIELY: Right.
4        MR. ANDERSON: If he says yes, he's
5    accepting that this is the transcript. If he says
6    no, he's saying he hasn't seen it. I suppose it's
7    not accepting it's a transcript, but if he says yes
8    to that --
9        MR. KIELY: You haven't heard what I'm
10    going to ask him yet.
11        MR. ANDERSON: Yes, but within the question
12    is the assumption that this is an accurate
13    transcription. I have never seen an accurate
14    transcription of a tape-recorded statement. I'm not
15    suggesting that people are phonying them up on
16    purpose. I'm just saying they're never accurate.
17    I'm just saying within your question is the
18    assumption that this is in fact accurate.
19        MR. KIELY: As opposed to your assumption
20    that it's inaccurate.
21        MR. ANDERSON: Correct.
22        MR. KIELY: So, you're assuming it's
23    inaccurate. And for the sake of this deposition,
24    I'll assume it's accurate. And then, I'm going to

DUNN & GOUDREAU

PAUL WILLETT                                                                    JANUARY 6, 2006

Page 114

1    ask your client some questions about it. And he's
2    had a chance now to read --
3              MR. ANDERSON: Correct, but if every
4    question is based upon the accuracy --
5              MR. KIELY: You haven't heard any question
6    that I've asked him yet.
7              MR. ANDERSON: I know that, but you're
8    asking questions that you assume are accurate. For
9    all I know, the inaccuracies are irrelevant, but when
10   you refer to it as your transcribed statement --
11             MR. KIELY: We'll give you a standing
12   objection on the record that the entire transcript's
13   inaccurate, okay, and we'll go from there.
14             MR. ANDERSON: No. I made my objection. I
15   want to state my objection. I have no problems with
16   you asking him each question is that true or not
17   true. I just don't want you to ask a question, which
18   he authenticates the statement, which I tend to
19   doubt, since it was two years ago, whether he
20   remembers verbatim, and you've never produced the
21   tape recording itself. So, I mean, I have no way of
22   knowing whether this is accurate and neither do you
23   other than compare it to the tape. That's all I'm
24   saying.

Page 115

1    Q.  Sir, you had a chance to read that document that has
2        a series of questions and answers, correct?
3    A.  Uh-huh.
4    Q.  I'm sorry, you have to say yes.
5    A.  Yes.
6    Q.  And you do remember meeting with Mr. Sweeney, don't
7        you?
8    A.  Yes.
9    Q.  And you remember that you recorded that
10       conversation, correct?
11   A.  Yes.
12   Q.  Is there anything in those questions and answers that
13       you've had now a chance to read that you think is
14       inaccurate or you think needs to be changed?
15             (WITNESS PERUSING DOCUMENTS)
16   Q.  Were you referring a minute ago to the section that
17       says you think it might have been October 20th or
18       October 17th?
19   A.  Yeah.
20   Q.  So, those dates may not be correct?
21   A.  Yeah, because I don't remember October 20th or
22       October 17th coming up.
23   Q.  I think you're right, by the way. Because I think
24       the settlement sheets from the trip, that doesn't

Page 116

1    make sense. So, I think that's probably true.
2    A.  Right. Like I said, it was so long ago and the dates
3        could have been...
4    Q.  That's fine. It appears to you like that
5        October 20th or 17th date might not be accurate.
6    A.  Something's not right there from what we went over
7        this morning.
8    Q.  That's fine. Anything else that you've seen that you
9        think might be inaccurate?
10   A.  I mean, I could have been off on some of the things
11       by a day or two.
12   Q.  The dates?
13   A.  Yeah, because it's been so long.
14   Q.  Sure. Anything other than dates or times?
15   A.  (Witness perusing document) Then he asked me was it
16       on the tip of your toe, I told him it was on the
17       top. That didn't -- I said when it swelled up,
18       that's when the --
19   Q.  I understand. And you explained in your deposition
20       you're actually talking about the top surface of your
21       toe as opposed to the tip?
22   A.  Right. When it swelled up, that's when it just
23       busted.
24   Q.  The swelling and the pressure, that was on the tip,

Page 117

1    but not where you felt you were cut with the shell?
2    A.  Right. That's when the whole thing just went
3        somewhere. I told you about calling for a
4        prescription. I was kicking something out of the
5        pile, too. It pretty much says everything I said,
6        except he never asked me about talking to Tommy,
7        pretty much.
8    Q.  That's fine. I just wanted to give you a chance to
9        read it and see if there was anything you wanted to
10       change, or if there was anything you thought wasn't
11       right. You told me about the dates.
12   A.  I mean, after all this time, I haven't looked at
13       anything since.
14   Q.  Let me ask you to take a look at your tax returns --
15             MR. KIELY: And, by the way, for the
16       record, I don't want to get into our debate again.
17       That was a copy of a document that is labeled,
18       "Transcribed Statement of Paul Willett," and counsel
19       and I have already discussed our various feelings on
20       the accuracy of transcribed statements, but that's
21       what the document is called and it's been marked as
22       Exhibit 1 for identification.
23   Q.  Let me show you a series of documents that have been
24       marked Exhibits 2 through 6, which I'll tell you were

DUNN & GOUDREAU

Page 118

produced to me by your counsel, I believe they
represent documents reflecting tax returns from 2000
to 2004. If you'll just take a look at those. You
do whatever you want with them, I don't need you to
go through them with a fine-tooth comb. I'm just
going to ask you some real general questions about
them once you've had a chance to just take a look at
them.

A. Yes. These are my tax returns, I believe. (Witness
perusing documents) Those look like them.

Q. The first one from 2000, that was when you were
filing on your own; is that correct?

A. Yes. That's when I was still single, just before I
got married.

Q. And that reflects earnings of 32,449, is that
correct, if you look at that first page? I'm sorry,
wrong number. Down at the bottom, 36,170?

A. (Witness perusing document) Yeah, that's what it
says.

Q. In 2001, was that the first year that you and your
wife began filing jointly?

A. Yeah.

Q. And just so I'm clear, if you look at the cover page
of your 1040 for 2001, on line 7 it says "Wages,

Page 119

salaries, tips, et cetera, 54,559," does that
represent what your wife was earning?

A. No. I think that's what I earned that year.

Q. Down at line 12 it says, "business income," and that
says 36,686.

A. I think that was her income. I'm not really good at
these tax papers, but I believe that's hers.

MR. ANDERSON: Do you have 1099s attached?

THE WITNESS: I've got 1099s on other
things.

MR. KIELY: The numbers don't add up to the
same amount, though.

Q. Did your wife work for Dr. Prohovich?

A. Yes.

Q. Well, there's a W-2 here that indicates that your
wife made -- working for Dr. Prohovich, that your
wife made $54,559 in 2001?

A. Okay.

Q. So, does that change your memory at all about which
one of those figures represent what you made and
which one of those figures represent what she made?
If it doesn't, it doesn't.

. I can't...

. Do you do your own taxes, or do you have an

Page 120

1    accountant do it?
2  A. We have a person do it.
3  Q. Who does your taxes?
4  A. Lois Augustine.
5  Q. Does she work for a business?
6  A. No. She's in New Bedford.
7  Q. Does she do a lot of fishermen's taxes? How did you
8     come to go to Lois Augustine?
9  A. Eric Paiva, you know, told me about her.
10 Q. You don't know her address, do you?
11 A. No. It's in the phone book.
12 Q. What did you make -- well, if you look at 2004,
13    without reference for a second to the tax return, do
14    you have any recollection, any independent
15    recollection of what you made roughly the year before
16    you were injured?
17 A. The year before --
18 Q. As a scalloper?
19 A. I believe the last year I worked I made like 98,000.
20 Q. You yourself did?
21 A. Yeah.
22 Q. As opposed to the joint filing?
23 A. Right.
24 Q. And your wife was working full time, too?

Page 121

1  A. Right.
2  Q. And you claimed everything -- I mean, did you declare
3     everything on your taxes that you made? Would there
4     be income that wasn't on your taxes is what I'm
5     getting at?
6        THE WITNESS: When I was fishing?
7        MR. KIELY: Yes.
8  A. Basically, no.
9  Q. Did you go on unemployment at some point?
10 A. There was points in there that I went on
11    unemployment.
12 Q. After your injury and as a result of not being able
13    to fish, did you go on unemployment?
14 A. Yeah, I did collect unemployment after.
15 Q. And I assume you gave that information to your tax
16    preparer, or do you know?
17 A. At the end of the year, when you get all of your
18    slips, you turn them into her and she does her --
19    what she does.
20 Q. And that would have been one of the slips that you
21    gave her, whatever you got for unemployment?
22 A. Right. Because you get a...
23 Q. You get something from them?
24 A. Yeah. I turned in all my slips.

PAUL WILLETT                                                                    JANUARY 6, 2006

---

Page 122

1   Q.  I just want to make sure that it all showed up
2       somewhere on the taxes, that's all.  Is there
3       anything that you can't do now, physically can't do
4       now that you could do before your injury?
5   A.  Well, I can't walk around -- physically, I can't walk
6       around barefoot even in the house, or anything like
7       that, or when I go swimming, because I'm in the water
8       a lot.
9   Q.  Is that because of the bone situation that you
10      explained?
11  A.  Yeah.  I always have to wear either teevers or water
12      shoes.  I can't walk around and I can't physically
13      take the long hours, like scalloping.  I can't do
14      that.  I mean, I can't do the 18 hours or, you know,
15      I can't do the long stretch anymore.
16  Q.  What happens if you do that?  Is there pain?
17  A.  I tried it once.  My foot that's cut up, I mean, the
18      time I tried it, by the end of the watch, you know,
19      by the end of, you know, eight hours or six hours, I
20      mean, just basically standing there cutting, it's
21      just...
22  Q.  Painful?
23  A.  The longer I stand like that, it gets painful.  I
24      mean, through the day, if I walk a lot, you know, at

---

Page 123

1       the end of the day, my foot gets real painful, but
2       you know, if I'm having a normal day like this, it's
3       all right, but when I exert myself or try long hours
4       on my feet, that's when it really...
5   Q.  Is there anything nonwork-related -- other than what
6       you told me about, having to wear water shoes or that
7       type of thing, is there any nonrelated-work things
8       that you used to do, any kind of activities?  I don't
9       know, any hobbies or sports that you can't do now
10      because of this injury?
11  A.  I mean, I don't think I would go play racquetball
12      anymore, you know.
13  Q.  Have you tried it?
14  A.  No.  I haven't even attempted.  I used to play quite
15      a bit.  It wouldn't tempt me.  That side-to-side
16      movement would kill me; that kind of side-to-side
17      stuff would kill me.
18  Q.  Anything other than the racquetball?
19  A.  No.  I do -- you know, I still, you know, do physical
20      stuff.
21  Q.  You mentioned that you have a follow-up appointment
22      with your doctor, you're going to try to get in on
23      Monday; is that correct?
24  A.  Yeah, because I'm supposed to go back to work next

---

Page 124

1       week.  I've got a chance to go back to work.  They
2       want me to go in early, because somebody got hurt.
3       So, I'm trying to get my appointment to get -- if I
4       don't go in, I would have had my regular appointment.
5       So, I'm trying to change it, so I can get off that.
6   Q.  Get it done before you have to go back?
7   A.  Hopefully, I can.  If not, I just have to wait until
8       I get back.
9   Q.  Do you have any appointments lined up or any
10      treatment scheduled that relates to your foot right
11      now?
12  A.  No.
13          MR. KIELY:  That's all.
14          MR. ANDERSON:  I have nothing.
15          (DEPOSITION CLOSED AT 2:50 P.M.)
16
17
18
19
20
21
22
23
24

---

Page 125

1              C E R T I F I C A T E
2       I, the undersigned, PAUL WILLETT, do hereby
3   certify that I have read the foregoing deposition
4   taken on January 6, 2006, and that it is true and
5   correct to the best of my knowledge, information, and
6   belief (with the exception of the following
7   corrections listed below):
8   Page   Line         Correction
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14
15
16  Signed under the pains and penalties of perjury this
17  _____ day of _____, 2006
18
19
20          _____
20          PAUL WILLETT
21
22
23
24

---