UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12449 EFH

PAUL WILLETT,               )
            Plaintiff       )
                            )
        v.                  )
                            )
E & S FISHERIES, INC.,      )
            Defendant       )

**DEFENDANT E & S FISHERIES, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STRIKE
THE PLAINTIFF'S AFFIDAVIT OF PAUL WILLETT AND PLAINTIFF'S
<u>OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Now comes the defendant E & S Fisheries, Inc. (the "defendant" or "E & S Fisheries")

and hereby moves this Court, pursuant to Fed. R. Civ. P. 12(f), to strike the plaintiff's Affidavit

of Paul Willett ("Willett Affidavit") and the Plaintiff's Opposition to the Defendant's Motion for

Summary Judgment.  The defendant seeks to strike the Willett Affidavit because it directly

contradicts the plaintiff's deposition testimony, was offered only after the defendant filed a

motion for summary judgment, and is self-serving.  Furthermore, the defendant seeks to strike

the Plaintiff's Opposition to the Defendant's Motion for Summary Judgment because it is based

solely on the unfounded and contradictory statements asserted in the Willett Affidavit.  Within

this memorandum, the defendant makes reference to portions of the Plaintiff's Deposition

(attached as **Exhibit A**), and the Willett Affidavit (attached as **Exhibit B**).  As the grounds for

this Motion to Strike, the defendant states the following:

## FACTS

On January 6, 2006, the deposition of Paul Willett (the "plaintiff" or "Willett") was taken, during which time the plaintiff made statements about the alleged cause of his injuries and the circumstances surrounding the injury to his second left toe.  In his deposition, the plaintiff said that at the time of his injury, the vessel was "laying," which refers to the drags being at the gallows and up on the side of the boat, and the engine was shut down and out of gear.  Plaintiff's Deposition, 43:6-13.  The plaintiff made his first mention of a deck hand known as "Mikey" who worked during the first-half of the plaintiff's morning watch.  Plaintiff's Deposition, 40:6-11.

The plaintiff stated that he was on deck with "Mikey" that morning and that it was around noontime.  Plaintiff's Deposition, 43:20-44:6.  After the deck hands, including the plaintiff, got all of the totes and boxes loaded up, the captain of the vessel sounded the horn for the drags to be flared.  Plaintiff's Deposition, 44:18-22.  When the horn was sounded, the plaintiff then went "as fast" as he could to flare out the drag on his side of the vessel, while "Mikey" went to flare the drag on the opposite side.  Plaintiff's Deposition, 44:6-9; 44:23-45:3.  It was at that time that the plaintiff "felt the big stab" in his foot.  Plaintiff's Deposition, 45:4-5.  The plaintiff described wearing sweat pants, black leather boots, and a pair of oiler pants.  Plaintiff's Deposition, 45:16-20.

The plaintiff said that he was in the process of running or walking quickly across the deck from the port side to the starboard side to flare the drag.  Plaintiff's Deposition, 48:19-49:8.  The plaintiff then said that "Mikey" "could never flare the starboard side because he was too short," and that "(h)alf the time [the plaintiff would] have to flare both sides because ["Mikey"] was too short."  Plaintiff's Deposition, 49:9-13.  After making this general statement about

2

assisting "Mikey" "(h)alf the time," the plaintiff did not then state, or even imply, in his deposition that "Mikey" was the cause of the plaintiff's injury on October 25, 2003, nor that on that particular day "Mikey" failed to perform the normal and expected work of a deck hand by not flaring a drag.

The plaintiff stated that he thought "Mikey" was "too small and too weak" and that "Mikey" "had a hard time putting bags away," but the plaintiff failed to mention or allege that he was injured on the morning of October 25, 2003 because he had to run from one side of the deck to the other, in order to flare out the drag that "Mikey," the other deck hand on duty, should have been flaring. Plaintiff's Deposition, 40:16-17; 41:21-22. The plaintiff's only references to "Mikey" in his deposition are stated above and are included in the excerpts of the plaintiff's deposition transcript, attached as "Exhibit A." Furthermore, the plaintiff did not offer deposition testimony that had another deck hand been on duty with him at the time, he would not have been injured, as he alleges in the Willett Affidavit.

In the Willett Affidavit, filed just before the deadline for the plaintiff's opposition to the defendant's motion for summary judgment tolled, the plaintiff alleges a different cause of his injury that departs from his deposition testimony. The plaintiff now asserts that "[b]ecause of [Mikey's] extremely small size 'Mikey' was unable and unfit to perform the normal work of a deckhand on a scalloper," including carrying "the heavy containers of scallops." Willett Affidavit, ¶5. The plaintiff also alleges that "Mikey" could not flare a drag on the vessel if it "was moving or if the weather was at all rough." Willett Affidavit, ¶8. The plaintiff states that he was injured when he hit his foot on a pile of scallops because he "was running because [he] had to flare both dredges." Willett Affidavit, ¶9. The plaintiff's statements in the Willett

3

Affidavit are contradictory to his deposition testimony and are assertions that the plaintiff failed to make when he had the opportunity to do so.

## **ARGUMENT**

It is established law that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *See* Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5, *citing* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §2726, at 30-31 (2d ed. Supp.1994). In the facts of Colantuoni, the plaintiff submitted a sworn affidavit after the opposing parties had filed their motions for summary judgment. In the affidavit, the plaintiff directly contradicted his deposition testimony. *Id.* at 4. In addition, the affidavit did "not discuss any early confusion at his deposition testimony" and why the plaintiff might have changed his testimony. *Id.* at 5. The U.S. Court of Appeals for the First Circuit stated that it was "significant that the affidavit was offered only after [the opposing parties] had filed motions for summary judgment." *Id.* at 5. Furthermore, the Court stated that the plaintiff's affidavit "should be disregarded in considering the propriety of summary judgment." *Id.*

Additionally, courts have held that a "nonmoving party cannot create a material issue of fact and defeat summary judgment simply by submitting affidavits that contradict its previously sworn statements." *See* Ng Brothers Constr. v. Cranney, 436 Mass. 638, 648 (2002), *citing* Phinney v. Morgan, 39 Mass. App. Ct. 202, 207 (1995), O'Brien v. Analog Devices, Inc., 34 Mass. App. Ct. 905, 906 (1993). In the Ng Brothers case, the plaintiff filed several affidavits in response to the defendants' motion for summary judgment. *Id.* at 646. The court stated that the

4

use of the plaintiff's affidavits as the "bare assertion to the contrary" of the defendant's documentary evidence "raises no genuine issue of material fact." *Id.* at 648. Furthermore, a party "cannot create a disputed issue of fact by the expedient of contradicting by affidavit statements previously made under oath at a deposition." *See* O'Brien, 34 Mass. App. Ct. at 906, *citing* Perma Research & Dev. Corp. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). The O'Brien court also stated that it was not, "after all, as if [the plaintiff] had become possessed of newly acquired evidence when she made her affidavit." *Id.* at 906.

Similar to the facts of O'Brien, the plaintiff in the case-at-bar prepared an affidavit only after the defendant filed a motion for summary judgment, and just before the plaintiff's extension for filing any oppositions was to expire. In the plaintiff's situation, his alleged injury occurred on October 25, 2003, nearly two and one-half years ago. Since that time, the plaintiff has not become privy to any "newly acquired evidence," but rather has altered his testimony based on his failure to provide testimony that is a strong basis for his legal theories of liability.

Paralleling the facts in Colantuoni, the plaintiff here has been an interested witness who has "given clear answers to unambiguous questions" during his deposition and prior to filing the Willett Affidavit. Colantuoni, 44 F.3d at 4-5. The plaintiff, as an interested witness, cannot now create a conflict and resist the defendant's motion for summary judgment with an affidavit that is clearly contradictory to previous statements on the circumstances surrounding the injury to his left second toe, but without explaining why he never blamed "Mikey" in his deposition. Furthermore, the plaintiff cannot use the Willett Affidavit to alter his deposition testimony in which he testified generally about "Mikey" and his capabilities as a deck hand, rather than about "Mikey's" alleged direct involvement in the plaintiff's injury. Plaintiff's Deposition, 40:16-17;

5

41:21-22.  It is also significant that the plaintiff's affidavit was offered only after the defendant

had filed a motion for summary judgment.  *See* <u>Colantuoni</u>, 44 F.3d at 5.

WHEREFORE, for the reasons stated above, the defendant respectfully requests that this

Court strike from consideration the Willett Affidavit because it directly contradicts the plaintiff's

deposition testimony, was offered only after the defendant filed a motion for summary judgment,

and is self-serving.  Furthermore, the Plaintiff's Opposition to Defendant's Motion for Summary

Judgment is based solely on the statements asserted in the Willet Affidavit, which have proved to

be unfounded and should be stricken.

For the Defendant,
E & S Fisheries, Inc.
By its attorneys,

**REGAN & KIELY LLP**


/s/ Robert E. Kiely
Robert E. Kiely, Esquire (BBO ##556640)
85 Devonshire Street
Boston, MA 02109
(617)723-0901
rek@regankiely.com


Date:   March 9, 2006

6

# EXHIBIT A

Page 1

```
1                                        Volume I
                                         Pages 1-126

2
                 UNITED STATES DISTRICT COURT
3            FOR THE DISTRICT OF MASSACHUSETTS
4                            C.A. NO. 04-12449EFH
5
6    PAUL WILLETT,                    :
                    Plaintiff,        :
7                                     :
     vs.                              :
8                                     :
     E & S FISHERIES, INC.,           :
9                Defendant.           :
10
11
12        DEPOSITION of PAUL WILLETT, taken on behalf of
          the Defendant, pursuant to the applicable provisions
13        of the Massachusetts Rules of Federal Procedure,
          before Barbara M. Montijo, a Registered Professional
14        Reporter and Notary Public within and for the
          Commonwealth of Massachusetts, at the offices of
15        Regan & Kiely, LLP, 82 Devonshire Street, Boston,
          Massachusetts, on January 6, 2006, commencing at
16        11:00 a.m.
17
18
19
20
21
                         DUNN & GOUDREAU
22            COURT REPORTING SERVICE, INC.
                      One State Street
23                  Boston, MA   02109
                      (617) 742-6900
24
```

PAUL WILLETT                                          JANUARY 6, 2006

---

Page 2

1    APPEARANCES:
2    DAVID F. ANDERSON, ESQUIRE
     LATTI & ANDERSON, LLP
3    30-31 UNION WHARF
     BOSTON, MA 02109
     TELEPHONE NO. (617) 523-1000
     FOR: PAUL WILLETT

     ROBERT E. KIELY, ESQUIRE
     REGAN & KIELY, LLP
     82 DEVONSHIRE STREET
     BOSTON, MA 02109
     TELEPHONE NO. (617) 723-0901
8    FOR: E & S FISHERIES, INC.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 3

1                 I N D E X
2
     WITNESS                        PAGE
3
       PAUL WILLETT
4
         Examination by Mr. Kiely . . . . . . . . .  4
5
6              E X H I B I T S
7    NO.  DESCRIPTION                PAGE
     (Defendant)
8
9    1   Transcribed Statement of Paul Willett . . . .  4
10   2   2000 1040 Income Tax Return . . . . . . . . .  4
11   3   2001 1040 Income Tax Return . . . . . . . . .  4
12   4   2002 1040 Income Tax Return . . . . . . . . .  4
13   5   2003 1040 Income Tax Return . . . . . . . . .  4
14   6   2004 1040 Income Tax Return . . . . . . . . .  4
15
       *Reporter's Note:
16
       (Exhibits were retained by Attorney Kiely)
17
18
19
20
21
22
23
24

---

Page 4

1            (DEPOSITION COMMENCED AT 11:25 A.M.)
2            (EXHIBITS 1, 2, 3, 4, 5 AND 6 MARKED FOR
3            IDENTIFICATION)
4               PAUL WILLETT
5        The deponent, having been satisfactorily
6    identified and duly sworn by the Notary Public,
7    deposes and testifies as follows:
8            EXAMINATION BY MR. KIELY
9        MR. KIELY: Counsel have agreed to reserve
10   all objections, except as to the form of the
11   question, until the time of trial; and to reserve
12   motions to strike until the time of trial. Did you
13   want -- you don't want a notary or anything like
14   that?
15       MR. ANDERSON: No.
16   Q. Good morning, Mr. Willett.
17   A. Good morning.
18   Q. My name is Bob Kiely and I represent E & S Fisheries
19   in this lawsuit that's been brought on your behalf.
20   I'm going to be asking you some questions this
21   morning about yourself, and about your injury, and
22   some of the things that have happened since the
23   injury. If at any time I ask you a question that you
24   don't hear or you don't understand, can you let me

---

Page 5

1    know that? And I'll repeat it, or rephrase it,
2    hopefully, in a way that you can understand. Okay?
3    A. Uh-huh.
4    Q. One of the rules -- and your counsel may have told
5    you this. What's going on here is I'm asking you
6    questions, you're giving me answers and the
7    stenographer is taking it all down to create a record
8    of what the questions and answers are. So, part of
9    that has to be that you answer verbally. Because if
10   you look at me and nod your head, I understand you,
11   but it doesn't come out on the record.
12   A. Okay.
13   Q. The same thing applies to uh-hum or, you know,
14   uh-huh, those kinds of things.
15   A. You want yes or no.
16   Q. I want yes or no. But beyond that, I just want
17   verbal answers in general.
18   A. Okay.
19   Q. So, if you could do that, it's tough to remember
20   during the course of a depo, but if you could do
21   that, we'd appreciate it. If you need to take a
22   break at any time during the course of the
23   deposition, let me know, and you can talk to your
24   counsel or take a trip to the men's room, we will

---

DUNN & GOUDREAU

**Page 34**

1  A.  No.  You have to -- they have to apply to --
2  Q.  It's limited?
3  A.  Yeah.  Limited-access trips, that's what I mean.
4  Q.  Okay.  How many trips did you make before this
5      October 2003 trip on the LIBERTY, if you recall?
6  A.  I think five to six, or four to six.
7  Q.  So, from August to October you made somewhere between
8      four to six trips?
9  A.  Something like that.
10 Q.  That seems pretty active; is that normal?
11 A.  Well, my first trip over there wasn't on the LIBERTY,
12     it was on the JUSTICE.  That's his other boat.
13 Q.  The JUSTICE?
14 A.  Yeah.  The first trip I made over there was on the
15     JUSTICE.
16 Q.  And that's Dan Arletson's also?
17 A.  Yeah.  And I believe Tommy and Eric -- Eric's got the
18     VENTURE, Tommy's got the LIBERTY, and they share the
19     JUSTICE, the days on the JUSTICE.
20 Q.  To the best of your recollection, how many trips did
21     you make on the LIBERTY itself?
22 A.  Then it would cut it down by one trip, four to five.
23 Q.  All right.  So, three to five, somewhere in that
24     range?

**Page 35**

1  A.  Right.  Something like that.
2  Q.  Getting back to your duties as a deck hand on a
3      scallop boat, and particularly, what you did on the
4      LIBERTY, what would you do once you were out
5      scalloping?  What was your day-to-day routine?
6  A.  You'd get up early, cut scallops.
7  Q.  Was there a night watch as well as a day watch?
8  A.  Yeah.  We ran 8 and 8's, but you'd come out at least
9      an hour -- I believe it was an hour earlier.  I'd get
10     up early to start cutting.
11 Q.  Just to get real basic.  They pull up the scallops in
12     the net and they dump them on the deck?
13 A.  Right.
14 Q.  And then you as a deck hand -- someone would be
15     operating a winch to do that, I take it?
16 A.  Right, up in the wheelhouse.
17 Q.  And then you as a deck hand, once they dumped them
18     out, then you'd start cutting?
19 A.  Well, you...
20 Q.  Pick a pile?
21 A.  Most of the time on the LIBERTY we shoveled.
22 Q.  Describe that.
23 A.  You'd have a bunch of totes, fish totes, probably
24     three-and-a-half to four -- three-and-a-half feet

**Page 36**

1      long and about two feet wide.
2  Q.  That's like a container?
3  A.  Right.  And most of the time we'd shovel whatever we
4      caught right into the totes and we'd load up probably
5      about 20 totes each side, 15 to 20 totes each side.
6  Q.  So, a port watch and a starboard watch?
7  A.  Right, and then you'd fill up the boxes.  You'd fill
8      up the boxes first, then you'd fill up all the totes,
9      and then a lot of times we would just lay and cut.
10 Q.  What's the difference between the boxes and the
11     totes?
12 A.  The totes -- you shovel the scallops into the totes
13     on deck and the boxes are where you cut them.
14 Q.  So, you carry the totes over to the cutting box?
15 A.  Right.
16 Q.  Was there an inside area where the cutting box was?
17 A.  Yes.
18 Q.  And you wash them at the same time; is that how it
19     works?
20 A.  After you cut them, you wash them.
21 Q.  But that's all in that same area?
22 A.  Right.
23 Q.  How heavy are those totes?  How much would you load
24     them up before you'd carry them over?

**Page 37**

1  A.  I'd say -- it's been a long time.  I'd say anywheres
2      from 50 to 70 pounds.  I mean, depending on what we
3      were fishing in, if there was a lot of sand, gravel
4      and all that stuff sometimes.  Depending on where you
5      were fishing.
6  Q.  And you'd just pick them up with handles and walk
7      them over to the box?
8  A.  You'd pull them into like a staging area, I guess you
9      could call it.  And then once you had them over
10     there, once you emptied out the cutting box, you and
11     whoever you were working with would load the boxes.
12 Q.  Was there one of these stations on each side of the
13     boat, port and starboard?
14 A.  Yes.
15 Q.  Was there one area where you worked more consistently
16     when you were on the LIBERTY?
17 A.  Port side.
18 Q.  Who did you work with -- well, let me ask you this.
19     The three or four trips that you took on the LIBERTY,
20     was it the same crew each time?
21 A.  Right.
22 Q.  I've got the settlement sheets, I believe, from the
23     trip in October.  I don't currently have settlement
24     sheets from the trips before that for the LIBERTY.

PAUL WILLETT                                                    JANUARY 6, 2006

**Page 38**

1    Was there any difference in the crew?  If I have
2    settlement sheets that show what the crew was on that
3    October trip where you claim to have been injured, is
4    that going to be a different crew than the prior
5    trips you were on?
6  A.  80 percent of it was the same guys.  There was, I
7    believe -- I believe there was -- two or three of the
8    trips there was one guy -- Jimmy Botelho worked with
9    us, I believe one time, and this Mexican kid,
10   Armando, worked with us one time, and there could
11   have been another guy or two.  You know, a lot of
12   times you get a different -- six of the guys -- five
13   of the guys were pretty regular and there was one guy
14   there that could have changed a couple of times.
15 Q.  And to your knowledge, those guys that were pretty
16   regular, had they been on the LIBERTY for a while
17   before you started?
18 A.  I believe Tommy and three other guys had been there
19   for years.
20 Q.  Do you know those three other guys specifically that
21   had been there for a while?
22 A.  Rick, Jose, and Cully.
23 Q.  Is that a nickname?
24 A.  Yeah.  And then, the other two guys that were there

**Page 39**

1    were a Vietnamese guy they called Lam and another
2    Vietnamese guy they called Mikey.
3  Q.  You think those were the guys that came in and out a
4    little bit more frequently?
5  A.  Lam -- I believe Lam was there all except the last
6    trip I was there, and I think Mikey was there every
7    trip I was there.  They changed -- there's one guy
8    that comes and goes every so often.
9  Q.  Now, when you would pick up the scallops and carry
10   them over to that staging area that you talked about,
11   what was the next step that you did?
12 A.  You'd shovel the scallops into the tote, drag the
13   totes over to just outside the door, and you'd stack
14   them up and then you'd fill up the box.  And then
15   when everything was full, you'd start cutting.
16 Q.  And then what do you do with the remnants from when
17   you're cutting, is there somewhere you throw that?
18 A.  When you cut a scallop, you cut it and you throw it
19   down -- there's a chute on the other side of the box;
20   that goes down the chute and it's forced out by
21   water.
22 Q.  Off the deck and into the water?
23 A.  Right.
24 Q.  Was there anyone that you worked with particularly on

**Page 40**

1    your side -- you said port side you were on, right?
2  A.  Uh-huh.
3  Q.  I'm sorry, you've got to say yes for the record.
4  A.  Yes, I'm sorry.
5  Q.  Was there a set port side crew?
6  A.  I would mostly work with Mikey.  He was the --
7  Q.  Vietnamese guy?
8  A.  Little Vietnamese guy.  He was there the first half
9    of my watch.  Like, say we got on deck at 8 in the
10   morning, he'd be there until, I believe, 1.  I'd have
11   Mikey from 8 to 1, or 8 to 12, I forget what it was.
12   And then Lam would be there for the first hour or so
13   I got up.  He was on the other watch.
14 Q.  Were those guys good deck hands, in your estimation?
15   Did you have any problem with them?
16 A.  Lam, no problem.  Mikey was -- I didn't care for him
17   at all.  He was too small and too weak.
18 Q.  So, it's fair to say he had a problem humping that
19   50 to 70 --
20 A.  A very big problem.  It was almost heavier than he
21   was.
22 Q.  Aside from that, his size and relative strength, any
23   other problems you had with him?
24 A.  Verbally, no.  He was just terribly weak.

**Page 41**

1  Q.  No, I don't mean problems like he got into any
2    fights with him.  I just mean with the way he
3    conducted his job as a deck hand?
4  A.  Yeah, he didn't know his job at all.
5  Q.  What effect, if any, did that have on you?
6  A.  Working with him made my job a lot harder.  I
7    actually liked it when he went to bed because then
8    I'd work with Jose -- me and Jose would load the
9    boxes.  Mikey was useless.
10 Q.  When you say "made your job harder," it just gave you
11   more to do?
12 A.  Yeah, because he was a very weak person.
13 Q.  How about the other members of the crew, did you make
14   any observations about their abilities as deck hands?
15 A.  All of them were decent men on a boat.
16 Q.  Other than Mikey?
17 A.  Yeah, Mikey was useless.
18 Q.  Did you ever talk to Captain Nichols about that, or
19   Dan Arletson?
20 A.  No.  They knew he was a very weak person.  It was
21   general knowledge.  I mean, he had a hard time
22   putting bags away, he had a hard time down in the ice
23   hole, he had a hard time taking -- he made life hard
24   on people.

Page 42

1  Q.  Let's talk about the October trip.  What do you
2      recall about the trip?
3  A.  We were laying and cutting.  It was --
4  Q.  Where were you, first of all?
5  A.  I believe we were 60 to 70 miles off Point Pleasant
6      in Jersey.  I was on deck, so I'm not sure exactly
7      where we were.
8  Q.  I understand, but that's a general vicinity?
9  A.  I believe so, yeah.
10  Q.  Put it this way, had you been down that way with the
11      LIBERTY before?
12  A.  We had fished in quite a few different places, but we
13      could have been down there on one of the other -- I
14      forget exactly, because I know one time we were at
15      the edge, and then we were down at this other place,
16      so we had been to the southern a couple of times, I
17      believe.
18  Q.  How far into the trip were you?
19  A.  Four or five days, I believe.  Five days.
20  Q.  And this was one of those longer trips that you
21      mentioned as opposed to one of the closed-area
22      trips?
23  A.  I believe we were on -- an open-access trip it was
24      going to be.  So, I don't believe we were in a closed

Page 43

1      area, because there would have been -- I believe it
2      was an open-access trip.
3  Q.  You mentioned that at the time you believe you were
4      injured, you were laying and cutting?
5  A.  Yes, we were.
6  Q.  What's the laying part of that?  I think I get the
7      cutting.  What are you referring to when you say
8      laying?
9  A.  The drags were at the gallows.  The drags were up on
10      the side of the boat, just hanging there.  The engine
11      was shut down and out of gear.  I believe the engine
12      was shut down that morning.  They usually shut it
13      down when we lay and cut.
14  Q.  Does that make any difference with regard to what
15      you're doing?
16  A.  That means there's plenty of scallops.  There's big
17      piles of scallops on the boat.
18  Q.  More work for the deck hands, in other words?
19  A.  More work for everybody when you've got a lot of
20      scallops.
21  Q.  Tell me what you recall happening with regard to your
22      injury.
23  A.  I remember being on deck with Mikey that morning and
24      it was --

Page 44

1  Q.  Was it light?
2  A.  I believe it was daytime.  I believe -- I'm not
3      exactly -- I believe it was -- it was the daytime
4      watch.  I believe we set out midmorning, around
5      noontime or something because there was two of us
6      that were on deck.  So, he was still on deck with me,
7      I believe, when we flared them out.  I went on the
8      side that I would flare out and he went to the side
9      that he would flare out.
10  Q.  And you had pulled the scallops back on and now you
11      were cutting?
12  A.  We had the drags at the gallows, the deck was loaded,
13      all the totes were loaded, and then we loaded --
14      then, before we went to set out, we almost got
15      everything cut out, all the totes, all the boxes.  We
16      reloaded the totes, we reloaded all the boxes.  We
17      got everything done.  I guess prior to that they
18      started the engine up again.  And once we got
19      everything all loaded up and everything, that's when
20      Tommy put her in gear and got back on the tow; and
21      that's when he rang the horn, the buzzer, whatever
22      you want to call it, for us to flare the drags.
23  Q.  And what happened next?
24  A.  When he did that, we -- I forget.  You know, they

Page 45

1      called it the hailer or whatever.  When he did that,
2      that's when I ran across the deck, you know, because
3      you try to go as fast as you can to do stuff, because
4      that's how the job is; and that's when I felt the big
5      stab in my foot, you know, the -- something's gone
6      through on the top -- on my toe there.
7  Q.  And for the record, we're talking about your left
8      foot?
9  A.  Right.
10  Q.  And the second toe next to the big toe on your left
11      foot?
12  A.  Right.
13  Q.  Or that might be deceiving.  The toe next to your big
14      toe?
15  A.  Right.
16  Q.  What were you wearing at the time?
17  A.  I had sweat pants.  I think sweat pants on or long
18      johns on.  I used to wear like shorts with long johns
19      and black leather boots, then a pair of oiler pants,
20      and then probably -- I can't remember if it was cold
21      or not that day -- a half sweat shirt or something
22      on; or if it was cold, I had a hood on.  I don't
23      remember whether it was cold.
24  Q.  The black rubber boots, you mentioned, were those

PAUL WILLETT                                                                                    JANUARY 6, 2006

Page 46

1    your boots?
2    A.  Yes.
3    Q.  So, the equipment that you brought on at least --
4        well, strike that.  The black rubber boots you were
5        wearing were yours?
6    A.  Right.
7    Q.  And then you also mentioned you had oilskins?
8    A.  Yes.
9    Q.  Were those yours as well?
10   A.  Yes.
11   Q.  And all the clothing that you described to me, that
12       was yours, too?
13   A.  Yeah.
14   Q.  So, if we can call that your equipment, that
15       equipment, that's something that you brought onto the
16       boat with you?
17   A.  Yeah.
18   Q.  None of that was given to you by the LIBERTY?
19   A.  No.
20   Q.  How long had you had the boots?
21   A.  I believe they were fairly new, a trip or two.
22   Q.  The same kind you always use?
23   A.  Yeah.  There's like only two kinds they use.
24   Q.  Do you remember the brand name, or the type?

Page 47

1    A.  I don't remember whether they were the black ones or
2        the brown -- it was one of the better pairs you buy.
3        I forget which brand they were.
4    Q.  How high do the boots go?
5    A.  Probably midcalf.
6    Q.  And those are the ones you always wear?
7    A.  Uh-huh.  Yes, sorry about that.
8    Q.  What about the oilskins?  Do they come down over the
9        top of the boot?
10   A.  Right.
11   Q.  So, you don't tuck them into the boot?
12   A.  You don't tuck them into the boot.  They go on the
13       outside of the boot.  And then, I would fold them
14       over and I had two elastic bands, so the water don't
15       run up your boots.
16   Q.  You did that all the time?
17   A.  Right.
18   Q.  That was your regular practice?
19   A.  Right.
20   Q.  And on the day that you felt this jab -- we'll call
21       it a jab; is that fair?
22   A.  Yeah.
23   Q.  You had yourself dressed like that?
24   A.  Right.  And I remember I had oilers on that day

Page 48

1        because sometimes I would just use an apron if it was
2        nice out, but it must have been a little cold that
3        day.
4    Q.  What's the difference between the two, by the way?
5    A.  An apron just hangs around your neck and goes around
6        you.  And then, you know, it goes down to about
7        midcalf.
8    Q.  Like a regular apron?
9    A.  Yes.  Just like a regular apron, but it's made out of
10       the same material as the oilskins.
11   Q.  So, in the warm weather, you don't want to put pants
12       on, you just want the apron?
13   A.  Yes.
14   Q.  And you wear it with the boots?
15   A.  Yes.
16   Q.  But you're pretty certain you had the oilskin pants
17       on?
18   A.  I believe so, yeah.
19   Q.  You said you were in the process of running or
20       walking real quickly to another part of the boat when
21       you felt it?
22   A.  Uh-huh.  From the -- yes, from the cutting box to the
23       stern.
24   Q.  Okay.  And what were you going to do when it

Page 49

1        happened?
2    A.  I was going to flare the drag.
3    Q.  And just quickly explain what that means.
4    A.  Flaring the drag means getting the drag so -- getting
5        the drag ready to set out.
6    Q.  You were walking down the port side?
7    A.  I went from the port side to the starboard side,
8        because I'd go across the deck.  I'd go from the port
9        box to the starboard box.  And Mikey would go
10       straight to the port side because he wasn't -- he
11       could never flare the starboard side because he was
12       too short.  Half the time, I'd have to flare both
13       sides because he was too short.
14   Q.  In any case, you were on your way -- had you gotten
15       to the starboard side, or were you on your way to the
16       starboard side?
17   A.  I was on my way.
18   Q.  What was on the deck as you were walking across?
19   A.  Piles of scallops.
20   Q.  Is that unusual?
21   A.  Not when you're laying and cutting.
22   Q.  Which is what you were doing?
23   A.  Right.  You'd have to climb -- a lot of times you'd
24       have to climb over piles.  I guess we had pretty good

PAUL WILLETT                                                JANUARY 6, 2006

Page 50

1    size piles.
2    Q.  What was the deck on the LIBERTY?  Is it the tiles,
3        the nonskid tiles, standard?
4    A.  I believe when you step out of the cutting box --
5        inside had nonskid tiles, maybe the first 6 feet
6        outside the door had nonskid tiles.  Then, it had an
7        oak planked deck, you know, from the strongback out.
8        And then, the last 10 or 8 feet of the deck was just
9        plain steel until you get to the rail.
10   Q.  The part of the deck where you were walking when you
11       felt that, what was the surface there, if you know?
12   A.  Oak plank.
13   Q.  When you felt that jab in your foot, what did you
14       do?
15   A.  It hurt a lot, but I just -- I felt it jab me real
16       hard.  I ran over and I finished flaring the drag.
17       And then, I went and sat on -- after I flared the
18       drag, I went and sat on the strongback, undid my
19       elastics, took my boot off, took my sock off, wiped
20       my foot down.  And then, I shook my sock out and then
21       I got dressed as quick as I could so I could go back
22       to work.
23   Q.  You did that right there on the deck?
24   A.  Right there on the deck.  Right in the middle of the

Page 51

1        deck.  I sat on the strongback after I flared the
2        drag.
3    Q.  That jab that you felt, had you ever felt that
4        before?
5    A.  No.
6    Q.  When you, as you described, took your boot off and
7        then took your sock off, what did you see?
8    A.  I just -- I really didn't look for anything.  I just
9        wiped my foot off and shook my sock out real good.
10   Q.  Did you check to see whether there was something in
11       your boot that you might have jammed your toe into or
12       stepped on?
13   A.  When I took my boot off, I took my boot off and
14       turned it upside down and banged it to make sure
15       there was nothing there.  After I did all that, I got
16       dressed back up -- you know, I put everything back, you
17       know, together and went right back to work.
18   Q.  When you did that with your boot, when you shook it
19       out, banged it, did anything fall, or did you see
20       anything?
21   A.  Yeah.  There was like shells and dirt and that kind
22       of stuff that came out.
23   Q.  So, when you shook your boot, you did get something
24       that fell out?

Page 52

1    A.  Yes.
2    Q.  What exactly did you see that fell out of your boot?
3    A.  You know, there was stuff in my boot.  It got in
4        from being out there.
5    Q.  Scallop shells?
6    A.  Yeah.
7    Q.  Anything else?
8    A.  Sand, dirt, probably some -- whatever we were in that
9        day.
10   Q.  I'm sorry, what do you mean by "whatever we were in
11       that day"?  I'm not sure.
12   A.  Well, I mean --
13   Q.  You mean the bottom, what you were dragging?
14   A.  Yeah.  Yeah.
15   Q.  So, it could be sand, it could be dirt?
16   A.  It could be little coral type -- you know, any of
17       that kind of stuff.  You know, I shook it out
18       (Smacked hands).
19   Q.  Did you check your other boot at the same time?
20   A.  No.
21   Q.  Were you surprised that that material was in your
22       boot when you shook it out?
23   A.  Sort of, yeah.  Yes.  You know, it did shock me to
24       get stabbed that hard.

Page 53

1    Q.  Aside from that, I understand that that was not
2        expected when you got jabbed in the toe, were you
3        surprised that you had bits of shell and some sand or
4        whatever was in the bottom of your boot?  Is that
5        something that happens on a scallop boat?
6    A.  Yeah.  After every watch or something, you shake --
7        after every watch, I shake out my oilers because
8        there's always stuff that gets between you in there.
9        And when I take off my stuff, I always used to turn
10       it upside down and shake it out.
11   Q.  Including your boots?
12   A.  Right.
13   Q.  And it wouldn't be unusual for you to find shells and
14       stuff in your boots?
15   A.  No.
16   Q.  After you had shaken out your boot and took off your
17       sock, did you look at your toe where you had felt the
18       jab?
19   A.  Yeah.
20   Q.  Did you see a cut?
21   A.  Not right there because I did it so quick.
22   Q.  Did you see any blood?
23   A.  Not right then.
24   Q.  Was there anything remaining on the toe, like a

PAUL WILLETT                                                                    JANUARY 6, 2006

Page 122

1   Q.  I just want to make sure that it all showed up
2       somewhere on the taxes, that's all. Is there
3       anything that you can't do now, physically can't do
4       now that you could do before your injury?
5   A.  Well, I can't walk around -- physically, I can't walk
6       around barefoot even in the house, or anything like
7       that, or when I go swimming, because I'm in the water
8       a lot.
9   Q.  Is that because of the bone situation that you
10      explained?
11  A.  Yeah. I always have to wear either teevers or water
12      shoes. I can't walk around and I can't physically
13      take the long hours, like scalloping. I can't do
14      that. I mean, I can't do the 18 hours or, you know,
15      I can't do the long stretch anymore.
16  Q.  What happens if you do that? Is there pain?
17  A.  I tried it once. My foot that's cut up I mean, the
18      time I tried it, by the end of the watch, you know,
19      by the end of, you know, eight hours or six hours, I
20      mean, just basically standing there cutting, it's
21      just...
22  Q.  Painful?
23  A.  The longer I stand like that, it gets painful. I
24      mean, through the day, if I walk a lot, you know, at

Page 123

1       the end of the day, my foot gets real painful, but
2       you know, if I'm having a normal day like this, it's
3       all right, but when I exert myself or try long hours
4       on my feet, that's when it really...
5   Q.  Is there anything nonwork-related -- other than what
6       you told me about, having to wear water shoes or that
7       type of thing, is there any nonrelated-work things
8       that you used to do, any kind of activities? I don't
9       know, any hobbies or sports that you can't do now
10      because of this injury?
11  A.  I mean, I don't think I would go play racquetball
12      anymore, you know.
13  Q.  Have you tried it?
14  A.  No. I haven't even attempted. I used to play quite
15      a bit. It wouldn't tempt me. That side-to-side
16      movement would kill me; that kind of side-to-side
17      stuff would kill me.
18  Q.  Anything other than the racquetball?
19  A.  No. I do -- you know, I still, you know, do physical
20      stuff.
21  Q.  You mentioned that you have a follow-up appointment
22      with your doctor, you're going to try to get in on
23      Monday; is that correct?
24  A.  Yeah, because I'm supposed to go back to work next

Page 124

1       week. I've got a chance to go back to work. They
2       want me to go in early, because somebody got hurt.
3       So, I'm trying to get my appointment to get -- if I
4       don't go in, I would have had my regular appointment.
5       So, I'm trying to change it, so I can get off that.
6   Q.  Get it done before you have to go back?
7   A.  Hopefully, I can. If not, I just have to wait until
8       I get back.
9   Q.  Do you have any appointments lined up or any
10      treatment scheduled that relates to your foot right
11      now?
12  A.  No.
13          MR. KIELY: That's all.
14          MR. ANDERSON: I have nothing.
15          (DEPOSITION CLOSED AT 2:50 P.M.)
16
17
18
19
20
21
22
23
24

Page 125

1              C E R T I F I C A T E
2       I, the undersigned, PAUL WILLETT, do hereby
3   certify that I have read the foregoing deposition
4   taken on January 6, 2006, and that it is true and
5   correct to the best of my knowledge, information, and
6   belief (with the exception of the following
7   corrections listed below):
8   Page    Line            Correction
9   ____    ____    _____
10  ____    ____    _____
11  ____    ____    _____
12  ____    ____    _____
13  ____    ____    _____
14
15
16  Signed under the pains and penalties of perjury this
17  _____ day of _____, 2006
18
19
20  _____
20      PAUL WILLETT
21
22
23
24

Page 126

```
 1    COMMONWEALTH OF MASSACHUSETTS
 2    BRISTOL, ss.
 3
 4         I, BARBARA M. MONTIJO, a Registered Professional
 5    Reporter and Notary Public, duly commissioned and
 6    qualified within and for the Commonwealth of
 7    Massachusetts, do hereby certify:
 8
 9         That PAUL WILLETT, the witness whose deposition
10    is hereinbefore set forth, was duly sworn by me, and
11    that such deposition is a true record of the
12    testimony given by the witness to the best of my
13    skill, knowledge, and ability.
14
15         IN WITNESS WHEREOF, I have hereunto set my hand
16    and my affixed notarial seal this _____ day of
17    _____, 2006.
18
19
20         _____
21              Registered Professional Reporter
22                    Notary Public
23    My commission expires: 1-12-2007.
24
```

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PAUL WILLETT,<br>        Plaintiff<br><br>VS.<br><br>E & S FISHERIES, INC.,<br>        Defendant | )<br>)<br>)<br>)    CIVIL ACTION<br>)    NO:  04-12449-EFH<br>)<br>)<br>)<br>) |

AFFIDAVIT OF PAUL WILLETT

I Paul Willett, under oath do depose and state as follows:

1.    I am the Plaintiff in the above matter.

2.    At the time I cut my toe I was a deckhand employed by the Defendant on the F/V LIBERTY.

3.    At the time I cut my toe I was on watch with a deckhand the crew called "Mikey" although I do not believe that this was his real name.

4.    "Mikey" was an extremely small person.  He was no taller than 5"4" and weighed between 100 and 125 pounds.

5.    Because of his extremely small size "Mikey" was unable and unfit to perform the normal work of a deckhand on a scalloper such as the F/V LIBERTY.  "Mikey" could not carry the heavy containers of scallops and could not perform the normal and expected duties of a deckhand that required normal strength, reach or size.

6.    When setting out a scallop dredge on a scalloper such as the F/V LIBERTY each of the two dredges (port and starboard) must be "flared".  Flaring a dredge requires a deckhand to reach

out over the rail and attach a rope to the bail of the dredge. Once the rope is attached the dredged is lowered into the water and the rope is used to rotate the dredge so that the dredge it is set out right side up.

7.     I have been commercial scalloping for 20 years and am familiar with the proper and customary procedure for setting out scallop dredges on a commercial scallop vessel such as the F/V LIBERTY. The proper and customary procedure for setting out the scallop dredges on a scallop vessel such as the F/V LIBERTY is as follows: While the vessel is under weigh the port side deckhand goes to the port side gallus frame and the starboard side deckhand goes to the starboard side gallus frame. Each deckhand then passes a line through the bail of his respective dredge. The captain then lowers each dredge while each deckhand flares the dredge so that each sets out right side up. Both dredges are then set out together so that one dredge is not set on top of the other.

8.     Because of his size, "Mikey" could not flare a dredge if the vessel was moving or if the weather was at all rough. As a result when "Mikey" was on watch working as a deckhand, the opposite side deckhand was required to quickly flare the dredge on one side and then run to the opposite side of the vessel to flare the other dredge. The captain of the F/V LIBERTY operates the winch controls from the wheelhouse and observes the entire set out procedure. At the time I cut my toe the Captain of the F/V LIBERTY was aware that "Mikey" could not perform his normal task of flaring his dredge and was aware that I as the opposite side deckhand would have to quickly flare one dredge and then run across deck to flare the opposite dredge.

9.     On the day of my accident I was on working as a deckhand and was on watch with "Mikey" as the opposite side deckhand. The vessel was under weigh when the Captain signaled to set out and as a result when I was required to quickly flare one dredge and then run across the

2

deck and flare the opposite dredge. At the time of my accident I was running across the deck to

flare the opposite side dredge when I hit my foot on a pile of scallops laying on wooden decking.

I hit my foot on the pile of scallops because I was running because I had to flare both dredges.

Had one of the other deckhands (other than Mikey) been on watch with me I would not have

been running across the deck, rather I would have flared one side while the other deckhand flared

the opposite side.  Upon hitting my foot while running across the deck, I felt something stab my

left 2nd toe.  After the gear was set, I sat down, and took off my boot and shook it out. While

doing so I observed bits of shell in my boot. For the remainder of the watch I felt pain where my

left 2nd toe had been stabbed. At the end of the watch I removed my boots and socks and

observed a small cut on my left 2nd toe in the location I had felt the stab.

10.    In the days that followed the wound on my 2nd toe became infected. I was initially taken

to a hospital in Point Pleasant, New Jersey for treatment of this infected cut.  After numerous

hospitalizations the doctors finally where able to get the infected cut under control but not until

they amputated my 2nd toe.

11.    The proper and customary procedure for setting a dredge on a commercial scalloper

requires two deckhands to set and flare the dredges. Because "Mikey" was not big enough to

perform the normal and expected work of a deckhand when setting out, I was required to quickly

perform the work of one deckhand and then run across deck and perform the work of the other

deckhand.  If "Mikey" had been able to flare his dredge I would not have been running to the

opposite side of the deck and I would not have hit my foot and cut my 2nd toe.

Pursuant to 28 U.S.C. 1746 I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 1st Day of March 2006.

PAUL WILLETT

4